## ALBERT C. SPALDING, Respondent, v. THE CHICAGO, BURLINGTON AND QUINCY RAILROAD COMPANY, Appellant.

### St. Louis Court of Appeals, March 31, 1903.

1. **Carrier: SHIPMENT CONTRACT BINDING: BAILER AND BAILEE.** The only contractual relation between plaintiff and defendant was that defendant agreed to carry the horses within a reasonable time and with due care from Browning to East St. Louis, and this relation could not be changed at the election of plaintiff, no matter how long the delay in forwarding them to their destination, or how much they depreciated in value.

2. ———: ———: ———: **ISSUES MUST BE MADE BY PLEADINGS.** In an action by a shipper of live stock against a carrier, the shipper alleged that the property was never received by him at its destination, and was utterly lost to him. The carrier answered, alleging that the property had been abandoned to it, by the shipper, while in transit, and that it had forwarded the property to the market, and sold it on the shipper's account, and tendered him the proceeds. This tender was renewed in the pleading. *Held*, that the issues as to whether the amount tendered was the net amount actually realized from the sale, and whether it was the amount that should have been realized, were not determinable under the pleadings.

3. ———: ———: ———: **CARRIER'S LIABILITY: NO WAIVER.** The refusal of a shipper of live stock to comply with the provisions of the contract of shipment, requiring that some one accompany the stock to care for them, and that they shall be loaded and unloaded, watered and fed by the shipper's agent, will not excuse the carrier from transporting the stock to their destination without reasonable delay, caring for them at the shipper's expense.

Appeal from Shelby Circuit Court.—*Hon. Nat. M. Shelton,* Judge.

REVERSED AND REMANDED.

*Mosman & Ryan* and *Dale & Humphreys* for appellant; *O. M. Spencer* of counsel.

(1) "Every substantive fact which the pleader must prove to maintain his action should, under the

practice act, be alleged so that the issue can be made thereon." Harrison v. Railway, 50 Mo. App. 336. The words of the Supreme Court in Link v. Vaughn, 17 Mo. 586, are very applicable here. It says: "The code requires the petition to contain a statement of the facts constituting the cause of action, in ordinary and concise language, without a repetition, and in such manner as to enable a person of common understanding to know what is intended." Clements v. Yates, 69 Mo. 623; Huston v. Tyler, 140 Mo. 264; Cole v. Armour, 154 Mo. 350. (2) "It is no objection that the petition sets out the contract and a compliance with its terms, and the termination of the contract by the defendant, provided it shows that the plaintiff elected to treat it as cancelled and seek to recover for services rendered." Glover v. Henderson, 120 Mo. 375.

*V. L. Drain* and *Dysart & Mitchell* for respondent.

(1) If the defendant had delivered the carload of horses at East St. Louis within a reasonable time and in a reasonably sound condition, then under the terms of the contract the plaintiff would have been bound to accept them and he would have had no valid claim or demand against the defendant. (2) The issues of fact submitted to the jury were found in favor of the plaintiff, and there was abundance of evidence to support the finding of the jury, and there was abundance of evidence to justify the instructions submitted to the jury on behalf of the plaintiff. George v. Railroad, 57 Mo. App. 358; Sloop v. Railroad, 67 S. W. 956.

BLAND, P. J.—The petition was in three counts. The appeal is from a judgment rendered on the third count. This count reads as follows:

"For another and further cause of action against the defendant, plaintiff states that on the second day of February, 1901, defendant, being a corporation and

common carrier as aforesaid, received of and from the
plaintiff, at its station at Browning, Missouri, on the
Chicago, Burlington & Kansas City railway, then and
now owned by the defendant, eighteen horses, of the
value of $1,800, the property of the plaintiff, and then
and there undertook and agreed to transport and carry
said horses to East St. Louis, in the State of Illinois,
and to deliver them to plaintiff at said destination
without delay and in a safe condition; but plaintiff
avers that the defendant negligently failed to so trans-
port, convey and deliver said horses at the said city
of East St. Louis, according to its contract and agree-
ment with the plaintiff, by reason whereof the said
eighteen head of horses have been totally lost to the
plaintiff and he has been damaged thereby in the sum
of $1,800, for which he prays judgment.

"And plaintiff avers that the whole amount of
damage sustained by him by reason of the premises
is the sum of $2,050, for which he prays judgment, with
other general and proper relief."

The answer to the third count is as follows:

"Defendant, for answer to the third count of the
petition, admits that on the second day of February,
A. D. 1901, the plaintiff delivered to this defendant at
its station at Browning one car loaded with horses for
transportation to East St. Louis; and defendant charges
and avers the fact to be that said horses were delivered
to it under and by virtue of a special contract then and
there entered into between the plaintiff, Albert C. Spald-
ing, and this defendant, for the transportation of said
horses, under and by virtue of which contract it was
agreed that in consideration of the free transportation
of one person, designated by the plaintiff, by said rail-
road company, to accompany the stock and care for the
same, that the said car and the said animals contained
therein should be in the sole charge of said person for
the purpose of attention and care for said animals; and
that this defendant should not be responsible for such

care and attention; and it was further agreed that said animals were to be loaded and unloaded, watered and fed and cared for by the owner thereof or his agent in charge, and that this defendant should not be liable for loss from theft, heat or cold, jumping from the cars or other escapes, injury in loading or unloading, injury which the animals might cause to themselves or do to each other, or any injury which resulted from the nature and propensities of the animals; and that this defendant did not agree by force of said contract to deliver said stock at destination in any specified time or for any particular market, but only to transport and deliver said horses with reasonable diligence, according to the usual manner of running its trains.

"This defendant says that it was further mutually understood and agreed by and between said plaintiff and this defendant that said animals should be carried and transported from the station of Browning to the station of Hunnewell, at which station the car containing said animals was to be set out for the purpose of giving plaintiff an opportunity to place in said car other and additional horses. Defendant says that it carried and transported said horses with reasonable dispatch on its regular train to the said station of Hunnewell, and at said station set said car out so that the plaintiff might finish loading the same by placing other horses therein.

"Defendant says that when said horses arrived at the station of Brookfield, the plaintiff telegraphed to the general freight agent of this defendant that the carload of horses was there at Brookfield at his disposal, and then and there abandoned said horses and all care and attention to the same.

"That defendant tried to get plaintiff to take care of said horses, but he refused to have anything to do with them; that defendant thereupon unloaded said horses and had them fed and cared for at the said station of Hunnewell, and endeavored to get plaintiff to

take charge of said horses which he refused to do; that thereupon the defendant shipped said horses to St. Louis and had them sold for the account of the plaintiff on the market in St. Louis, to which they had originally been consigned; that upon said sale the defendant realized the sum of $873.58 from the sale of said horses, after paying all expenses of freight and attention to said horses, and subsequently defendant tendered to plaintiff the said sum of money so realized from the sale of said horses, which plaintiff refused to accept, and defendant now here brings into court and tenders to the plaintiff herein the said sum of eight hundred and seventy-three dollars and fifty-eight cents and deposits the same with the clerk of this court 'for plaintiff and, having fully answered, the defendant asks to be dismissed with costs.''

The reply was a general denial of the new matter set up in the answer.

The summary of Albert C. Spalding's (plaintiff's) evidence, as set out in the abstract, is as follows:

''The horses mentioned in the third count I bought in Browning on Saturday to finish the contract, in order to fill the load out as near as I could. I bought a couple of big horses and the rest, except one nice black mare, were British horses for the British cavalry, to ship to the African war. They had contractors in St. Louis to buy that class of horses and they inspect them there. When the contractor gets his orders filled, why the buyers stop buying on the market and the market closes and horses have decreased all the way from $10 to $25 per head. These horses were bought Saturday afternoon and were a good class of British horses, also two big horses that I would call express ones and one nice road mare. I ordered a car there that morning and that afternoon they were loaded and were ready to go at three o'clock for East St. Louis to finish loading at Hunnewell, and I was to pay $5 extra to stop these horses at Hunnewell; that's what they charged me for

putting in horses, or setting out, either. To move, run the car up and put in the load they charged me $5 extra from Browning to East St. Louis. Browning is on the Chicago, Burlington & Kansas City Railway, which runs from Burlington to Laclede. When we got to Laclede there was one train going east there, but it pulled out in a few minutes. I told the operator that I wanted this load of horses out on the first train; that I wanted them out on the next train sure, and he said that there would be another train along directly and they would go on that. After a bit there was another train came along going east, an extra going east; that train passed. They were set on a sidetrack at Laclede, and switched around from one track to another, and I kinder watched the horses to see if they cut up any, and a third train went east. I asked the agent, 'Are you going to get these horses out to-night? They ought to be in St. Louis Tuesday morning, and I don't want them bucked around all night.' And he said: 'We will get them out as soon as we can,' and I think about the third train picked these horses up at Laclede and took them over to Brookfield, about five miles: I went down into the yard to see about them. I had no idea at all but what they would go out on the train. I asked one of the trainmen or one of the conductors where the horses were, and he said they were put in on the train, but would not go out for an hour or so. I think he said third 72. I met the conductor and he said that this car was set out. I went to the general telegraph office and asked why they did not get that load of horses out. I went back to the pen down in the yards and hunted them up, and found that they had been set up on one side of the switch and not going out on that train; then there was another train pulled out. Someone said No. 70, and I went in the office and looked at the trainmaster's board and found that there were six or seven trains, three 72's and two or three 70's, or something like that, but between three or four trains going out, and I saw the

yardmaster and said, 'Do you suppose I want to let these horses stand here all night?' He said they would go out on No. 78, but it is behind time and won't go out for a while yet. I went back to the office and talked to one of the dispatchers and begged him to get these horses out to put on the market. He gave me some short reply and said something about this load having to be filled out at Hunnewell. I told him that this load of horses was to be filled out there, and I did not want this part in bad shape. They were to fill out the load by paying $5, and I wanted to get my transportation, and I wanted to get the horses in St. Louis, and I said: 'Would you like to have a man standing around here all night?'

"'I asked him for a blank on which I stated to Mr. Ives, the general freight agent, a dispatch something like this: 'Horses shipped from Browning this date are here subject to your disposal.' That was about 10 at night. Three trains passed us at Laclede. An extra train is one that runs ahead of these regular trains. There are through freights, but I don't know just about them. I think my car arrived at Brookfield on the second 72. Four trains left Brookfield, but I don't know whether they were local or extra. There is a board on the right hand side in the hallway going into the train dispatcher's office. I saw on this board three No. 72's and two or three, two and maybe three, 70's and one 78. I saw every train on the board go out. I left Brookfield on No. 78, which was the sixth train to leave after I got there. We were at Laclede about two hours and the car was switched frequently from place to place and they were also switched at Brookfield considerably. At Brookfield I saw them throw the car in, switch around there. I was in Brookfield until some time around 10 o'clock. I got there about 6, I think. There were eighteen horses in the car. It was not a full load. That size of a load would be easier injured switching than a full load, the concussion of the engine

knocking around, the horses being loosely loaded, would be thrown down in the car. The tighter the load is loaded, the less mashing there is to them. I asked the agent at Browning if they would catch the train for St. Louis. It would do that if they were on time and they could get there. I guessed on the main line they would go. He informed me that the schedule time when this train would arrive at St. Louis was 6 the next morning.''

"By Mr. Mosman—Q. Did he inform you? A. I don't know. I would not say that he did at that time. I stated to the agent at Browning that I wanted these horses shipped to East St. Louis and finish loading at Hunnewell. I made the remark in his presence that these horses were bought for the British trade. I desired these horses to arrive in St. Louis on Sunday morning, as they were for sale to the British contractors. The sale of horses to the British contractors closed Monday in the afternoon. They finally left Brookfield at 10 o'clock.

"Q. What else do you know in reference to them until they got to Hunnewell? A. I left Brookfield on the same train. George Davis, the general stock soliciting agent for the defendant, came to me about 2:30 p. m. Sunday and wanted to know about turning the horses over to him. He wanted to know why it was done. I told him the general tough usage the horses had received in the handling of them from Browning to this pont. I told him the reason that I did it, and he got pretty angry at me. He went to the barn and one horse was rolling and tumbling in great agony, another had its head bruised, and one was so stiff that he could hardly walk. Davis said: 'You ought to take these horses and put in a claim for them,' and I told him that I would not take them unless he settled the damage that had already occurred, and he ordered the men to get medicine and doctor the horses and get them in shape to ship to-morrow. I saw a Mr. Fitzgerald on the train

who claimed to be general manager. He got off at Hunnewell and we examined the horses. The horses were in Hunnewell eight or ten days. I saw a boy giving the horses medicine, and a veterinary surgeon, named William Stevens, doctoring them. They were in first-class condition, ready to be shipped on the market, when loaded at Browning.

"Q. Now you may state if you know what condition these horses were in on the market at St. Louis? A. I considered them in very bad shape to be sold. I saw them unloaded and sold. Their condition was bad. Some of them had fallen away in flesh and some had bad bruises, some bruised up about the head, and one other horse was stiff, kind o' stove up, and one black mare in particular was all gaunted and looked like she had fallen away; well, she had no flesh at all. One pair of express horses, their condition was very bad; their hair looked like it was all standing up on end, and they looked like they had fallen away in flesh, and one or two were running at the nose. I think one of these big horses looked as though he ought to go to the hospital.

"Q. Now state, Mr. Spalding, what would have been the real value of those horses on the market at East St. Louis on schedule time after shipping orders on the day when they were due? What was the worth of those horses, the market value of those horses at Brookfield, or prior to their arrival at Brookfield in good condition, what would have been the market value? A. Well, I valued them all the way from $90 to $110 each. I would put them at $90. I judge that I have been shipping stock ten or twelve years. I shipped some while I was in the livery business, but not extensively like I have in the last four or five years. I think I shipped fifty carloads over the Burlington last year, the year before about forty, and the year before that not so many.

"By the Court—Well, forty or fifty cars a year?

A. Yes, sir. I don't remember when I ordered the car for this shipment. They were loaded about 3 in the afternoon and left Browning about 3:10. I don't remember the conversation that occurred when the car was ordered. I don't remember that I ordered it through the agent at Browning. I did talk to him when I signed the contract. He said that they were on time and made regular connection for St. Louis trains. This occurred while I was signing my contract and getting ready, about five minutes before train went out. I live on the Hannibal & St. Joseph railroad. I knew the time the trains went out of Brookfield, and knew if the trains would make their time, to get over there. I wanted to know whether this train would make its regular run to Laclede. That was what I was asking the Browning agent about, and his reply was that he thought that it would make its regular time. That was all the conversation that I know of that occurred. I think that we arrived in Laclede at 5:10 p. m., and the car was switched there to get it into the train on the Hannibal road. I knew it had to be switched from the C., B. & K. C. to the Hannibal at Laclede. The Hannibal track runs east and west and crosses the C., B. & K. C. track at right angles there. Brookfield was a division station on the Hannibal road. I don't know anything about the train provisions at Brookfield. Sometimes the trains go right through to be made up. But I have been on trains that go right through. Brookfield is a division station and headquarters, and I know Mr. Houlahan, the superintendent, there; and I have seen the trainmaster there. I could not see Houlahan there.

"Q. Did you go to his office? Did you go to the general agent's office at that station? A. I think I went in and asked him what time my stock would get out. The agent that runs the shipping department.

"Q. I am talking about the man that is general agent at Brookfield? A. I do not know the general agent or the local agent, or who anybody is. I went to

the agent and asked him what time the train went out.
I don't know his name. He was in the right office
where I go to order my cars. I don't know that it was
the freight agent's office. We got to Brookfield at 6
or 7 o'clock. I don't attempt to give the exact time.
I had two conversations with this man. With a tall
gentleman. I don't know his name, but he seemed to
be the general manager there in the dispatcher's office.
I don't think he was an operator, though. I asked an
operator and he called this man. I said I wanted to
get that stock out. I didn't want them banged around
in the yards. I wanted them on the market. Said
something like that to him. He said: 'Well, we will
get them out on the first train that we can get them out
on.' This was along about 8 o'clock, and something
after 9 I called his attention to it again. I think the
first man I had talked to had gone. I don't know
whether I spoke to the same man twice or to two dif-
ferent men. I would not say. He said that he could
not get the stock out before No. 78. He said the train
was behind time. I asked him where Mr. Ives' office
was, and he answered, 'In St. Louis.' I asked him for
a blank message and wrote out a message to General
Freight Agent Ives at St. Louis, and paid him forty
cents for the message blank and the man was a Western
Union man. The message was like this: 'The horses
shipped from Browning were laid out'—I don't know
exactly how many hours—'and they are here at your
disposal.' I wanted Mr. Ives, the general freight
agent, to handle this stock with better care. They were
at his disposal. . . . I meant for him to dispose of
the horses.

"Q. As he understood it, you had not anything
further to do with the horses. He could take care of
them? A. Yes, sir.

"Q. And you sent that dispatch so that he might
take care of them and you abandoned them there? A.
I don't know whether the agent called it abandoned or

what he called it.   I have stated all the conversation I had in the dispatcher's office.   The man said that the train would get into St. Louis at 4 o'clock Sunday evening.   I gave the message to Ives to one of the boys in the office.   Don't know that he gave it to the man I had been talking to.

"Q.   Did you have anything further to do with the horses after that time?   A.   No, sir.

"Q.   He did not understand you that you had any further claim on them?   Your purpose was to turn them over?   A.   Yes, sir.   I think that I talked to two men in the office.   I am not sure that I made any complaint to anybody else.   I talked to Joe McDonald, one of the conductors of one of the trains.   The car had been set in on his train, and was taken off and put on another. I do not know what kind of a train McDonald had.   I saw McDonald's train moving out, but don't know whether it went out or went on a sidetrack.   I saw other trains leaving, but can not tell whether they passed beyond the switch.   I watched the caboose and they went out of sight.   Well, I saw as many as two or three trains.   I saw the hind end of two or three cabooses leaving the yard of the seven trains I mentioned.   I saw three at Laclede and four at Brookfield.

"Q.   Well, what switching did you see done at Laclede with your car?   A.   I saw my car on the west end of the switch and another time on the southeast switch.

"Q.   Where did you see it, in switching or in standing still?   A.   I saw it at Brookfield, after it was picked up on this train, being switched around.

"Q.   Was the engine ahold of your car on the switch?   A.   With other cars.

"Q.   But you did not watch that movement?   A. I noticed that they were giving it some awful jerks.

"Q.   I asked you if you watched that movement? A.   I noticed them on the train in there.

"Q.   I asked you if you noticed the manner in

which the switching was done. Did you notice that movement while it was being made? A. I did not watch it at the time it was done. Well, I saw it hit and thrown on the track. I saw it struck one time, and switched around on others. At Brookfield they were handling it with a lone engine. After those three movements it was placed in the yards some place. I did not watch it. Those three movements were the only movements I saw there at Brookfield. Some engines handle stock pretty nicely. The switch engine handles it nicely. At Laclede there was a rough movement on the south switch made in taking cars and setting them out for trains. I saw it move two or three times at Laclede. It was handled roughly on the east switch.''

The evidence of other witnesses tends to show that when the car of horses was unloaded at Hunnewell one of them was sick, one stiff and lame, one had a cut over an eye, one a cut on one hind leg and one a knot or lump on one of its fore legs; that some of them were discharging from the nose caused either by cold or distemper, and that all of them had the appearance of being gaunted and of having lost flesh. That when they arrived in East St. Louis they were in a bad condition for the market and one of them was sent to the hospital.

In respect to the running of trains on defendant's road, the testimony tends to show that trains Nos. 70 and 72, mentioned in the plaintiff's evidence as having passed through Brookfield while he was there, were on that occasion run in several sections; that they were loaded at Missouri river points with perishable freight and were fast through trains for St. Louis and Chicago and could not be delayed to pick up way freight or take the time to set out or pick up cars at way stations without demoralizing their schedule time, and that No. 78, by which the horses were carried from Brookfield to Hunnewell, was the usual and regular train for doing that character of work.

We note the following paragraphs of the contract of shipment as material to the issues of the cause:

"And in consideration of free transportation for one person, designated by the first party, hereby given by said railroad company, such persons to accompany the stock, it is agreed that the said cars, and the said animals contained therein, are and shall be in the sole charge of such persons, for the purpose of attention to and care of the said animals, and that the said railroad company shall not be responsible for such attention and care; and, further, that the second party shall not be liable to the first party, or to any of his servants, agents or co-partners, or other person, carried pursuant to this contract, for any injury or damage, from whatever cause, suffered or incurred while being so carried. And the first party agrees that, before setting out upon the journey, he will fully inform each of the persons to be carried pursuant hereto of the provisions of this contract in this regard.

"It is agreed that the said animals are to be loaded, unloaded, watered and fed by the owner or his agents in charge; that the second party shall not be liable for loss from theft, heat or cold, jumping from car, or other escape, injury in loading or unloading, injury which animals cause to themselves or to each other, or which results from the nature or propensities of such animals; and that the railroad company does not agree to deliver the stock at destination at any specified time, nor for any particular market. Shipment is made subject to the usual and ordinary delays incident to railway transportation, and it is agreed that no claim for loss shall be made on account of that nature."

It is in evidence that after the horses had been unloaded at Hunnewell, the defendant made ineffectual efforts to induce the plaintiff to reship the horses and to settle the matter with him.

The third count, on which the recovery was had, alleged that defendant negligently failed to transport,

carry and deliver the horses at East St. Louis by reason whereof they were totally lost to plaintiff, alleges their value to have been $1,800 and demands judgment for $2,050. Proof that defendant had converted the horses to its own use, or that they had been destroyed in a railroad catastrophe, or that they had been shipped to a wrong destination and thus lost to plaintiff, would have met the allegations of the petition. No such proof was offered. To sustain the allegations, the plaintiff offered evidence tending to show that the shipment was unreasonably delayed and that the horses were damaged by the negligent switching of the car in which they were loaded and that for these reasons he abandoned the shipment and turned the horses over to defendant. The court on this evidence held that the plaintiff had a right to abandon the horses and leave them in the possession of the defendant by giving the following instructions for plaintiff:

"3. The jury are further instructed, that if you believe from the evidence that there was an unreasonable delay in shipping and carrying the horses of the plaintiff, or that the said horses were so roughly and so negligently handled by the defendant's servants as to materially damage them or lessen their value, then the plaintiff had the right to abandon said horses, and leave them in the possession and control of the defendant, and in passing on the question of whether there was such unreasonable delay, or negligent handling, the jury should take into consideration all the circumstances shown in the evidence."

The court further held that plaintiff was entitled to recover of defendant the value of the horses at the time and place they were received for shipment, by giving the following instruction:

"6. If your verdict be for the plaintiff, then it becomes your duty to assess the damage, and you are instructed that the measure of damage is the value of the horses at Browning at the time received by the de-

fendant for shipment, as shown by the evidence; and in arriving at the value of the horses the jury should take into consideration all the facts and circumstances as shown by the evidence."

These instructions are clearly erroneous.

The only contractual relation between plaintiff and defendant, in respect to the horses, was that for a consideration the defendant agreed to carry them within a reasonable time and with due care from Browning to East St. Louis. The defendant was a bailee of the horses for hire and so long as they remained *in specie* this relation could not be changed at the election of plaintiff as bailor, no matter how long the delay in forwarding them to their destination or how much they may have depreciated in value. Hutchinson on Carriers, sec. 775; 3 Sutherland on Damages, sec. 905; Baumbach v. Gulf, C. & S. F. R'y Co., 23 S. W. (Tex.) 693; Scovill v. Griffith, 12 N. Y. 509; Briggs v. N. Y. Central R. R. Co., 28 Barb. 515; N. O., J. & G. N. R. R. v. Tyson, 46 Miss. l. c. 738-9; Hackett v. B., C. & M. R. R., 35 N. H. 390; Johnson v. Strader & Thompson, 3 Mo. 359; Redmon v. C., R. I. & P. R'y Co., 90 Mo. App. 68.

There was an utter failure of proof to sustain the allegations of the petition and the defendant's instruction in the nature of a demurrer to the plaintiff's evidence should have been given.

In respect to the tender of the amount realized by defendant on the sale of the horses, it was not made on the theory that plaintiff was entitled to recover anything on his petition, but on the theory set up in the answer that all he was entitled to was the net proceeds of the sale made by defendant. Plaintiff declined to accept the tender, or to submit his case on the defendant's answer. The defendant could not force the tender upon him, nor is he bound to accept the amount tendered as the net amount realized from the sale, or that should have been realized from it. As these matters

are open to dispute they will have to be settled under appropriate pleadings. It can not be done under the pleadings as they were made.

The contract of shipment shows that the horses were to be delivered to the shipper at East St. Louis; that he or some one for him should accompany the stock and have the sole charge thereof for the purpose of attending to and caring for the animals; that the railroad company should not be responsible for said care and attention, and that the animals should be loaded and unloaded, watered and fed by the plaintiff, or his agent in charge. The refusal of the plaintiff to perform these conditions of the contract did not exonerate the defendant from performing the contract on its part. It was yet bound to carry the horses to the place of destination without unreasonable delay and it was its duty to care for them and unload them at the expense of the plaintiff, since the covenants to be performed by the plaintiff did not go to the whole or a substantial part of the consideration for the contract, nor were they precedent to the obligation of the defendant to transport the stock. Springfield Seed Co. v. Walt, 94 Mo. App. 76.

The answer pleaded the contract in full, alleged the abandonment of the stock by the defendant while in transit and the transportation of the horses by defendant to the place of destination and their sale there on plaintiff's account. It seems to us that under the ruling in Chemical Co. v. Lackawanna Line, 70 Mo. App. 279, the plaintiff by an appropriate reply may admit that the horses were transported to East St. Louis and then allege the breaches of the contract by defendant upon which he may be entitled to recover damages. The measure of his damages, it seems to us, is the depreciation in the value, if any, of the horses, or any of them, on account of injuries received through the negligence of the defendant in handling and switching the

cars, plus loss or damage, if any, by reason of unreasonable delay in the transportation of the horses to East St. Louis, plus loss or damage, if any, occasioned by a negligent sale of the horses on the market at East St. Louis, from which should be deducted the contract price of the freight to be paid, the extra expense, if any, to which defendant was put to in caring for, feeding, watering and unloading the horses, plus a reasonable commission for selling them on the market.

The judgment is reversed and the cause remanded with leave to plaintiff to amend his reply, if so advised. *Goode, J.,* and *Reyburn, J.,* concur in reversal but are of opinion that plaintiff was entitled to make proof and recover under the allegations of the third count of his petition.