C. I. AMBER, DOING BUSINESS AS THE DENISON PRODUCE COMPANY, RESPONDENT, v. JAMES C. DAVIS, AGENT, APPELLANT.*

Kansas City Court of Appeals.   March 1, 1926.

450

. *Corpus Juris-Cyc References: Appeal and Error, 4CJ, p. 909, n. 67; p. 1053, n. 31; Carriers, 10CJ, p. 276, n. 8; p. 277, n. 14, 16; p. 349, n. 88; p. 369, n. 31; p. 373, n. 92; p. 400, n. 29; p. 401, n. 48; p. 402, n. 49; p. 480, n. 89; p. 524, n. 8; p. 543, n. 80; Damages, 17CJ, p. 816, n. 38; p. 1042, n. 28; Evidence, 22CJ, p. 205, n. 43; Railroads, 33Cyc, p. 45, n. 36; Release, 34Cyc, p. 1086, n. 99; Tender, 38Cyc, p. 171, n. 25; Trover and Conversion, 38Cyc, p. 2092, n. 55.

*Maurice Weinberger* and *John G. Park* for respondent.

*Homer Hall, F. P. Sebree, Sam B. Sebree, Henry L. Jost* and *Mord M. Bogie* for appellant.

ARNOLD, J.—This is a suit in two counts, each involving a separate shipment of a carload of eggs from Seneca, Kansas, to Chicago, Illinois. The case was tried by the court without the aid of a jury, resulting in a judgment in favor of plaintiff on the first count in the sum of $421.25 and on the second count in the sum of $1005.24, and defendant has appealed.

The cause of action covered by the first count was before this court in the case of Amber v. Payne, 239 S. W. 588, where practically all of the facts involved in that count are stated except some additional facts that will be hereinafter noted. We will dispose of this count first.

The petition alleges that plaintiff on the 6th day of April, 1918, delivered to defendant's predecessor, and the latter received, a carload of eggs consigned to Lepman & Heggie at Chicago, Ill., and on the same day he notified defendant's predecessor that Lepman & Heggie were not lawfully entitled to possession of the car, and defendant's predecessor agreed to deliver the car of eggs to F. Friedman of Chicago, to whom plaintiff had sold the eggs at thirty-four and one-half cents per dozen; that defendant's predecessor violated the said agreement and failed to deliver the eggs to F. Friedman but delivered them to Lepman & Heggie and "thereby converted same to said predecessor's own use;" that at the time defendant's predecessor agreed to deliver the eggs to Friedman, plaintiff notified him that he had sold the eggs to Friedman for thirty-four and one-half cents per dozen.

When plaintiff received Lepman & Heggie's rejection of the eggs, he went to the office of the assistant general freight agent of the Wabash Railroad Company, which defendant's predecessor was operating on behalf of the government. There he asked for the general freight agent and was introduced to the latter's chief clerk to whom he showed the original bill of lading issued by the Kansas City Northwestern Railroad, the initial carrier. He told the chief clerk that Lepman & Heggie had refused the car and that he had sold the eggs to Friedman at thirty-four and one-half cents per dozen and that he wanted the car delivered to Friedman. The chief clerk said he would wire Chicago (which he did later) and that if plaintiff would leave the bill of lading, he would endeavor to have the car diverted to Friedman. After a few days plaintiff received by mail the bill of lading with Lepman & Heggie's name erased and "F. Friedman, in care of Central Cold Storage Company, Kenzie & Dearborn streets" substituted, and the words "diverted as above by R. W. Owens, agent, Wabash Railroad" endorsed upon it, all in the handwriting of the chief clerk.

Defendant's predecessor and his representatives at Chicago paid no heed to the wire of the chief clerk and on the 10th day of April,

1918, delivered the car to Lepman & Heggie who took possession of the same and sold the eggs. On April 15th, Friedman wrote to plaintiff complaining of non-delivery. Plaintiff did not learn until about two weeks after his conversation with the chief clerk what had become of the eggs. On learning that they had been delivered to Lepman & Heggie, he again went to the office of the assistant general freight agent and the chief clerk suggested that he see Lepman & Heggie and if he could not get the full price of thirty-four and one-half cents a dozen from them, to file a claim with the assistant general freight agent for the balance.

At plaintiff's suggestion the chief clerk wrote plaintiff that the delivery of the eggs to Lepman & Heggie was due to the overlooking of the wire, that we have heretofore referred to, by the Chicago office of the railroad company. The letter also stated:

"However, Lepman & Heggie accepted the car and they are responsible to you for whatever amount was realized and we will ask that you take up with them for settlement on such basis, and that if there is any difference between what they realized from the sale and what you would have, had the diversion been accomplished, claim should be filed with us for this amount, not for the entire value of the car. . . . When you have received settlement from Lepman & Heggie, advise me and I will handle further for whatever amount may then be due from us."

Thereupon plaintiff made a trip to Chicago at an outlay of $50 and settled with Lepman & Heggie for $4225.75 and filed claim with defendant's predecessor for the balance, which claim defendant's predecessor refused to pay and plaintiff brought this suit.

The settlement with Lepman & Heggie was on the basis of thirty-two and one-half cents a dozen. There was some controversy between them in regard to another car so that the amount plaintiff actually received from Lepman & Heggie was $180 less than what he would have otherwise received for the eggs at the rate of thirty-two and one-half cents a dozen. The court rendered judgment for plaintiff on the first count for the difference between the amount received from Lepman & Heggie and the price at which the eggs were sold to Friedman, less $180 and plus $50 expense money, or $324.20, together with $97.05 interest from April 10, 1918, the day of the misdelivery.

Defendant insists that its demurrer to the evidence should have been sustained for the reason that Lepman & Heggie and defendant's predecessor were joint tort-feasors and that when plaintiff settled with Lepman & Heggie and gave to them a full release, he thereby released the defendant, and that section 4223, Revised Statutes 1919, relating to release of one or more joint tort-feasors without releasing all does not apply, for the reason that the release was ex-

ecuted in the State of Illinois and that the presumption is that the common law is in force there. This contention, no doubt, would be good if it were not for the fact that the settlement with Lepman & Heggie was as a result of an agreement with defendant's predecessor. The settlement was for the benefit of defendant's predecessor who was liable for the full value of the car of eggs. While the written release executed by plaintiff in favor of Lepman & Heggie purported to release all claims that plaintiff had against them, and as between the parties thereto, was no doubt a complete release, it was not such as between defendant's predecessor and plaintiff, for plaintiff and defendant's predecessor agreed that the settlement with Lepman & Heggie would merely be a discharge *pro tanto* of the defendant. To hold otherwise would be to permit the remaining joint tort-feasor to violate grossly his own agreement and thereby to sanction a most palpable fraud upon plaintiff and cheat him out of his money. Lepman & Heggie had refused to take the car and when plaintiff settled with them at thirty-two and one-half cents per dozen he did not recover all that he was entitled to. There was no ratification, as defendant contends, of the acts of defendant and Lepman & Heggie in delivering the car to the latter when plaintiff settled with Lepman & Heggie.

At defendant's request, the court declared the law to be that the chief clerk had no authority to write the letter to plaintiff concerning the making of the settlement with Lepman & Heggie for the reason that to hold otherwise would be allowing an unlawful preference to plaintiff not given to other shippers in direct violation of the laws of the United States. The writing of this letter and the circumstances surrounding the matters therein mentioned were not disputed at the trial. In fact, defendant's chief clerk admitted that he wrote it. We think there was no unlawful preference given to plaintiff in having him first settle with Lepman & Heggie and thereafter file a claim against the defendant for the balance of his loss. This correspondence took place after the carriage had been completed and the rights of the parties fixed and it was merely a method taken by defendant in settling plaintiff's loss which was clearly for the benefit of the defendant, as defendant was liable for the full loss. That there was no unlawful preference seems to us quite clear. [Roberts on Federal Liability of Carriers, section 156.] Defendant was not entitled to the declaration of law, and as the conclusion reached by the court was undoubtedly right, we may disregard this declaration of law. [Robinson v. Rice, 20 Mo. 229; Fairbanks-Morse Co. v. Stock Food Co., 151 Mo. App. 260; Baumhoff v. St. Louis & Kirkwood Ry. Co., 171 Mo. 120, 125.]

The tariff filed with the Interstate Commerce Commission provides that the carrier shall not be responsible for failure to effect a di-

version or reconsignment unless such failure is due to the negligence of its employees and that where exchange bills of lading are desired, they shall be issued only after the reconsignment is accomplished. There was ample evidence of negligence on the part of defendant's predecessor in his failure to make the diversion in this case and there is no evidence that the bill of lading was changed prior to the time the reconsignment was accomplished. The evidence shows a telegram was sent to the agent of defendant's predecessor at Chicago immediately upon receipt of notice from plaintiff that a diversion or reconsignment was desired. He did not receive the amended bill of lading until several days after this conversation, so the tariff provisions were complied with even if the changing of the bill of lading herein is to be construed as an exchanged bill of lading.

It is insisted there is no evidence of the reasonable market value of the eggs at the time of the conversion. The court allowed as special damages the contract price of the eggs as sold to Friedman. The evidence shows that while the eggs were in transit defendant's predecessor was notified that they had been sold to Friedman at the price and sum of thirty-four and one-half cents per dozen and therefore plaintiff was entitled to recover on the basis of the eggs being worth thirty-four, and one-half cents per dozen as special damages. [10 C. J., pp. 401, 402.] Plaintiff therefore was not confined to a recovery of the reasonable market value of the eggs at the time of the conversion.

The bill of lading contained the following provision:

"Any alteration, addition or erasure in this bill of lading which shall be made without any indorsement thereof hereon, signed by the agent of the carrier issuing this bill of lading, shall be without effect, and this bill of lading shall be enforceable according to its original tenor."

Section 8604-g U. S. Compiled Stat., 1918, provides:

"Any alteration, addition, or erasure in a bill after its issue without authority from the carrier issuing the same either in writing or noted on the bill, shall be *void* whatever be the nature and purpose of the change, and the bill shall be enforceable according to its original tenor."

Defendant insists that the agent of the Wabash Railroad had no authority to alter the bill of lading by striking out the name of Lepman & Heggie as consignee and inserting that of Friedman, for the reason that the bill of lading was issued by the agent in charge of the Kansas City Northwestern Railroad; that this alteration was made without the consent of that railroad; that under the circumstances the bill of lading was enforceable according to its original tenor, that is, with Lepman & Heggie as consignee, and that defendant's predecessor properly delivered the eggs to them. At common law the initial carrier might limit its liability to its own line but under the Cum-

mins Amendment that carrier was made liable as a matter of law for damages occurring upon connecting lines. Of course, the common-law liability of the terminal carrier for loss on its line remains in full force. [Oregon-Washington R. and Nav. Co. v. McGinn, 258 U. S. 409, 42 Sup. Ct. Rep. 332.]

It would appear that the section we have quoted from the bill of lading act was framed to protect the initial carrier from changes in the contract made without its consent. There has never been any question but that the owner of goods in transit has the right to divert them under proper conditions. [2 Hutchinson on Carriers (3 Ed.), section 660.] The bill of lading act recognizes the right of a person having a right of property or possession in the goods to request the carrier not to deliver the same to the consignee named in a straight bill of lading such as the one involved in this case. [Sections 8604-e and 8604-ee, U. S. Compiled Stat. 1918.] The entire act should be construed as a whole. Putting this construction upon the statute, there is no question but that when defendant's predecessor obtained information that Lepman & Heggie were not entitled to possession of the eggs and when he was instructed by plaintiff not to deliver them to Lepman & Heggie, defendant's predecessor was required to follow the instructions and rendered himself liable to plaintiff in failing to do so. This is true, even though section 8604-g is to be construed as making void, as to the consenting carrier, an attempt to divert the shipment by inserting a new consignee in the bill of lading without the consent of the initial carrier—a question we need not decide.

Complaint is made of plaintiff's declaration No. 3, in which the court declared the law to be that if plaintiff was entitled to recover, his damage should be assessed in a certain manner therein set forth, to which should be added the reasonable traveling expenses of plaintiff, not to exceed $50 "and interest at the rate of six per cent per annum from the date when said eggs should have been delivered to Friedman, to-wit, April 10, 1918." Interest is recoverable as a matter of right in an action for breach of the carrier's common-law duty. [Goodman v. Railway Co., 71 Mo. App. 460.] But at common-law there was some question as to whether interest should be allowed in a suit for conversion. However, this matter was cleared up in this State by the enactment of section 4222, Revised Statutes 1919, which reads as follows:

"The jury on the trial of any issue, or on any inquisition of damages, may, if they shall think fit, give damages, in the nature of interest, over and above the value of the goods at the time of the conversion or seizure."

It has been held that this section applies to a trial before the court, without a jury. [Wheeler v. McDonald, 77 Mo. App. 213.]

Since the passage of this statute, the Supreme Court has declared erroneous a peremptory instruction to allow interest on the value of the property taken. [State ex rel. v. Hope, 121 Mo. 34; Asadorian v. Sayman, 233 S. W. 467, 475.] A declaration of law is not similar to a peremptory instruction, but is merely an indication of the theory upon which the case was tried by the court and if, on the whole record, the judgment seems to be for the right party, errors in declarations of law will be regarded as non-prejudicial and will not work a reversal outright. [Rothenberger v. Garrett, 224 Mo. 191, 202; Baumhoff v. Railroad, supra.] The giving of declaration of law No. 3 shows that the court tried the case and awarded the interest upon the theory that plaintiff, as a matter of right, was entitled to recover interest. The rule enunciated in Rothenberger v. Garrett, and Wheeler v. McDonald, supra, applies herein and the court was in error in giving declaration of law No. 3.

There is some discussion in the briefs as to when, if at all, the interest should begin. But on account of the error in declaration No. 3, we need not discuss this point, for reasons that will appear hereinafter.

It is insisted the court erred in allowing $50 to plaintiff for expenses in making the trip to Chicago to settle with Lepman & Heggie. Plaintiff testified he spent $50 and on being asked if that was "reasonable" replied, "Well, it was as little as I could spend." Defendant insists that the question as to the reasonable value of the expenditure is not what was "as little" as plaintiff could spend, as he might spend a great deal more than some one else. We think there is no merit in this contention. Plaintiff's testimony is susceptible of the construction that he spent as little as could be spent. There was ample evidence as to the reasonableness of the expenditure. [See Johnson & Co. v. Ice Refrigerating Co., 143 Mo. 441, 452; Miller v. Brydon, 34 Mo. App. 602.] Plaintiff asked nothing for his time. His testimony is that he had sold the eggs to Friedman at thirty-four and one-half cents a dozen, and that was not hearsay. [3 Wigmore on Ev. (2 Ed.), sec. 1770.] Plaintiff had the right to show the circumstances giving rise to special damages. [Ryley-Wilson Groc. Co. v. Railroad, 184 S. W. 915; 10 C. J. 40.]

The second count asks damages in the sum of $770.62, growing out of a certain shipment of eggs by plaintiff from Seneca, Kansas, consigned to the James Produce Company, Chicago. The initial carrier was the Kansas City Northwestern Railroad and the connecting carrier the Wabash Railroad which was in charge of defendant's predecessor. The bill of lading with draft attached was mailed to a bank at Chicago and afterwards presented to the James Produce Company which paid the draft and took up the bill of lading. Thereafter the James Produce Company sold the car of eggs to Turner, Clegg &

O'Neal of Chicago and the bill of lading was turned over to that company. The concern last named was notified of the arrival of the eggs in Chicago, but on examination of the eggs in the car it was found seventy-five cases out of the 450 in the car were in a damaged condition. They refused to take the seventy-five cases but accepted the remainder of the shipment. Upon the refusal of the seventy-five cases they were turned over by defendant's predecessor to the Morehead Inspection Bureau, an agent of the railroad administration, which sold the eggs for an amount which, according to defendant's answer, brought the sum of $404.34. The eggs when shipped were in good condition but when they were inspected by the agent of Turner, Clegg & O'Neal at Chicago, the seventy-five damaged cases averaged twelve eggs to the case lost, eighteen eggs to the case "leakers" and thirty-six eggs checked and smeared; that the smeared and checked eggs are sold for six or seven cents less a dozen than No. 1 eggs and that "leakers" are sold for twelve cents less per dozen. Each case of eggs contained thirty dozen. Turner, Clegg & O'Neal and a representative of the Wabash Railroad Company tried to agree upon a settlement of the damaged eggs. No settlement was made by them and the eggs were sold by the Morehead Inspection Bureau, and the proceeds pocketed by defendant's predecessor. There is no evidence that the amount which the eggs brought ever was tendered to plaintiff or to any other person by defendant or his predecessor.

It is insisted that under section 8604, U. S. Comp. Stat. 1918, the James Produce Company, having taken up the draft and transferred the bill of lading to Turner, Clegg & O'Neal, plaintiff was no longer the lawful holder of the bill of lading. There is no evidence that Turner, Clegg & O'Neal had assigned whatever claim it may have had against the railroad to the James Produce Company or to plaintiff, nor is there any evidence of assignment from the Produce company to plaintiff. There were disclaimers filed in the trial of the case from the James Produce Company and from Turner, Clegg & O'Neal, disclaiming any interest in the proceeds of the sale of the damaged eggs. However, there is nothing in the Federal Statute cited which changes the rule theretofore existing giving the consignor the right to sue. That the consignor has the right to sue is well established. [Gratiot St. Warehouse Co. v. Railroad, 124 Mo. App. 545; Ross v. Railroad, 119 Mo. App. 229.] The Federal Control Act subjects the carriers under Federal control to all loss and liabilities as common carriers, whether arising under State or Federal laws or at common law. [Mo. Pac. Ry. Co. v. Ault, 256 U. S. 593.]

The petition alleges delivery of the carload of eggs to defendant's predecessor and that he agreed, in consideration of certain freight charges to transport the eggs to Chicago.

". . . and at the latter place to deliver the same to plaintiff or his agent or assigns in as good condition as when received by said predecessor but plaintiff says that said predecessor, in violation of his said agreement and in total disregard of its duties as a common carrier aforesaid, so carelessly and negligently conducted itself in the premises that seventy-five of the said 450 cases of eggs, each case containing thirty dozen eggs and of total value of $770.62, were greatly injured and were tendered to plaintiff's consignee in a damaged condition, and were rejected by said consignee and thereafter defendant's predecessor converted and sold said damaged eggs.

"Wherefore plaintiff prays judgment in the sum of $770.62 with interest after tender April 11, 1918, and costs of action."

The petition seems to combine in one count a suit for violation of defendant's common-law duty to carry the eggs safely to destination, and a cause of action for conversion of the eggs in their damaged condition. No attack was made on the petition at the trial. It is insisted that there is no evidence of conversion; that Turner, Clegg & O'Neal should have accepted the entire shipment, sold it and then made claim for damages; that the eggs were of a perishable nature and when Turner, Clegg & O'Neal refused to accept them, defendant's predecessor was within his rights in making the sale, and, in fact, it was his duty to sell the eggs at the best price obtainable.

The evidence shows that plaintiff paid to the James Produce Company $770.62 on account of the seventy-five cases of damaged eggs. It is not clearly brought out in the evidence whether, under plaintiff's contract with the James Produce Company the eggs were to be delivered by plaintiff to that company in Chicago, but that is the plain inference from the evidence, and if so, defendant's predecessor was plaintiff's agent and plaintiff was responsible to the Produce Company for the damage done to the eggs in transit. The assignee of the James Produce Company, the consignee, refused to accept the eggs because they were damaged and did not come up to contract and plaintiff was required to pay the James Produce Company the contract price. Under the circumstances we do not think that it was incumbent upon either Turner, Clegg & O'Neal or the James Produce Company to accept the damaged eggs. And while defendant's predecessor might have had the right to sell the eggs (the perishable nature of the commodity considered), he could not sell them for his own benefit but only for the benefit of the person entitled to them. The evidence shows that defendant and his predecessor have retained the proceeds from the sale of the eggs and have never paid, or tendered, the amount thereof to any person. In his answer defendant states that he holds the money subject to the payment thereof to its owner, which defendant believes is Turner, Clegg & O'Neal, and that plaintiff is making claim therefor and defendant

"now offers to pay said amount into court for the use and benefit of its real owner that may be shown in court." There is no evidence that any money was ever paid into court. This being a law case, their mere offer to do equity is not sufficient. [Whelan v. Reilly, 61 Mo. 565, 569; Pauley v. Business Men's Assurance Co., 261 S. W. 340, 342, 343.] Defendant's predecessor, having sold the eggs and retained the proceeds, must be held to have converted them to his own use. The cases of Spalding v. Railroad, 101 Mo. App. 225 and Redmon v. Railroad, 90 Mo. App. 68, cited by defendant, are not in point.

The manner in which the suit is pleaded is somewhat unusual but this comes from the peculiar facts surrounding the transaction. As before stated, plaintiff apparently combines in one count a suit on the common-law liability of defendant's predecessor with one in conversion. We think the court properly rendered judgment for the market value of the seventy-five cases of eggs. If the causes of action stated in the second count had been brought in two counts—one on the common-law liability to carry the eggs safely to Chicago and the other for conversion of the eggs in their damaged condition—plaintiff's measure of damages on the first count would have been the difference between the market value of the eggs had they arrived in good condition and their market value in the condition in which they actually did arrive; and on the second count his measure of damages would have been the market value of the damaged eggs converted. These two items of damage, of course, are equal to the market value of the eggs in Chicago had they arrived in good condition. In effect, the court rendered judgment as though the two causes of action in the second count were pleaded separately. While there was no direct evidence as to the reasonable market value at the time of the conversion, the price at which the eggs were sold to the James Produce Company was some evidence of their market value. [Johnson & Co. v. Ice Refrig. Co., supra; Miller v. Bryden, supra.]

It is insisted there was no notice of claim for the damages as required by the bill of lading. This was a matter of defense and there is no evidence in the record of the lack of such notice. It seems to have been the court's theory that plaintiff was entitled to recover the full value of the seventy-five cases of eggs on account of the fact that they were damaged in transit. This is shown in the court's declaration of law No. 3. This declaration given on the second count contains the same fault as declaration No. 3 in the first count which we have considered above, and we need not discuss it further.

If, within ten days, plaintiff will remit the amount of interest allowed under each count of his petition, the judgment will be affirmed; otherwise it will be reversed and the cause remanded for a new trial. *Bland, J.,* concurs; *Trimble, P. J.,* absent.