RAY REALTY COMPANY, A CORPORATION, APPELLANT, v. ISADORE HOLTZMAN, RESPONDENT.—119 S. W. (2d) 981.

St. Louis Court of Appeals. Opinion filed September 30, 1938.

*Henry H. Furth* for appellant.

*Moldafsky & Moldafsky,* for respondent.

McCULLEN, J.—This suit was begun in a justice of the peace court in the City of St. Louis by appellant herein, who will be referred to herein as plaintiff, to recover from respondent, who will be referred to as defendant, the sum of $510, as rent for an apartment from September 3, 1931, to March 2, 1932, a period of six months, at $85 per month.

Plaintiff alleged in its petition in the justice of the peace court that defendant had entered into a lease with it for said apartment for a term of two years from March 3, 1930, and had paid the rent under said lease up to September 2, 1931, and had abandoned the premises on October 6, 1931, and paid no further rent.

Defendant filed an answer in which he admitted the lease and the tenancy, and pleaded that plaintiff had installed an incinerator in the apartment building, which, because of its failure to destroy and dispose of the garbage that accumulated therein, caused, allowed and permitted rats, mice, roaches, and bugs to overrun the premises

occupied by defendant; ·and caused an obnoxious odor therein on account of dead rats and mice remaining in a decomposed condition between the walls and under the floors; and that plaintiff, although informed thereof, failed to remedy said condition, thereby allowing and permitting the premises to become untenantable and unfit for peaceful occupancy by defendant. Defendant admitted in his answer that when he abandoned the premises, there was rent from September 3rd to October 6th, 1931, amounting to $93.50, unpaid and due to plaintiff, and stated in his answer that "defendant hereby tenders into this court the said sum of $93.50 for the benefit of the plaintiff." Included in the answer of defendant was a "Counterclaim or Set-Off" in which defendant asked for damages by way of a set-off in the sum of $60.05, for money expended by him for renovation and repair of his rugs and furniture, and the cost of removing his household goods from the premises.

The trial before the justice of the peace resulted in a judgment in favor of defendant. Plaintiff appealed from that judgment to the circuit court, where a trial was had before the court without a jury, a jury having been waived, resulting in a judgment for plaintiff for $93.50; and also for plaintiff on defendant's counterclaim, but the costs of the case were adjudged against plaintiff. The court made a separate finding of facts. After an unavailing motion for a new trial, plaintiff brings the case to this court by appeal.

Plaintiff contends that the finding of the circuit court that defendant was deprived of the beneficial use of the premises because of the presence of vermin therein is without any support in the evidence. It is also contended by plaintiff that the finding of the court that plaintiff, as landlord, was responsible for the presence of vermin on the premises during the period of the lease because of neglect to properly consume the garbage in the incinerator, which was the direct reason for the presence of vermin in said apartment in such great numbers, has no support in the evidence.

An examination of the evidence shows that this complaint is not well founded. Plaintiff produced only two witnesses—Mr. and Mrs. Leon Marglous. Mr. Marglous was vice president and Mrs. Marglous was secretary of the plaintiff corporation.

Mrs. Marglous testified that she managed the apartment; that it was a six-family apartment; that a new incinerator was put in the building in 1927; that it was necessary to keep a fire in it every morning to burn up all the garbage thrown in the incinerator. She said: "I received reports from Mr. Holtzman that there were rats and mice in the building, but we had an exterminator to take care of them." She further testified that she had no record of the number of times the exterminator company had been out there; that the agreement with the exterminator company was for once a

month, but that she would call whenever it was necessary. Mrs. Marglous further testified that she notified Wilson, the janitor at the building, about "complaints from Holtzman about the bugs and rats around there." In this connection Mrs. Marglous said: "I received numerous complaints from Holtzman, and I told the janitor to watch it more carefully and to watch the building more careful on account of receiving several complaints." She stated that she had inspected the premises occupied by defendant Holtzman, and "I did not see any rats and bugs in their home but I did see some in the basement. . . . When we received a complaint of an odor, I told him why not investigate the plaster walls of the basement."

It appears from the evidence, without contradiction, that defendant sent a letter of complaint to Henry R. Weisels Co., Inc., agent of plaintiff for the property in question, in which he stated that during the past year he and his wife had reported the condition complained of to the agent and to Mr. Marglous. In that letter defendant said:

"An influx of black bugs, mice, and the odor in our place is simply unbearable. Have taken the matter up with your janitor, Wilson, and he tells us that the only possible explanation of same is that one or several mice or rats which ate some of the stuff left by the exterminator on the premises crawled in between the walls or partitions and died, therefore he can do nothing to remedy same."

In the same letter defendant stated that he would be forced to vacate if the condition was not remedied within ten days; that his wife was ill from said conditions; and that "several nights ago, we invited some friends for the evening, and the odor was so terrible we had to take them out for a ride to get away from same." It further appears that the letter of complaint sent by defendant was received by plaintiff's agent, who stated, in acknowledging receipt thereof, that the same had been forwarded to the owner with instructions to take care of it at once. The letter of complaint sent by defendant was dated April 16, 1931, and the letter of plaintiff's agent acknowledging receipt thereof was dated April 20, 1931.

Cornelius Wilson testified on behalf of defendant that he was janitor in charge of the premises mentioned during the period of time defendant occupied one of the apartments therein; that before defendant moved out of the apartment, witness had occasion to tear up part of the ceiling to remove dead mice, and removed four; that he reported to Mrs. Marglous, and also to the exterminator company that had been working there, that "there were bugs around the place while the Holtzmans lived there." Asked as to the cause of the bugs, the witness said: "Well, I could not say whether it was from the incinerator or not, but they were there." The witness further testified that to relieve the condition of the

bugs around there, he would spray the kitchen and then on the outside between the window jambs, and the two kitchen windows; that after he sprayed the kitchen, Mrs. Holtzman swept the bugs out, and he shoveled them up with a number one coal scoop which was about eight inches wide and fourteen inches long; that he would get complaints two or three times a week; that prior to the time this work was turned over to him, an exterminator company had been doing it; that the incinerator in the building "is the type you build a fire, you light it and build a fire in it. The garbage would accumulate in it until I built a fire in it. It is a modern incinerator. These bugs would be accumulated around the incinerator. They would scatter all over the place. I noticed some obnoxious odor on account of dead mice. Mrs. Marglous was there quite a bit—two or three times a day, or two or three times a week. Holtzmans would complain to me about the odor."

On cross-examination the janitor testified that the incinerator could consume all of the garbage if a fire was built in it. He further said: "There was quite a bit of garbage. I had an incinerator to burn the garbage, and I did it to the best of my ability, but I had to have kindling with which to do it. I did not have enough kindling." The witness further testified that no one prevented him from getting kindling; that when the fire was built the garbage would be consumed; that the incinerator had a chute from the third floor down; that it was between the kitchen windows and the partition of the wall.

Defendant Isadore Holtzman and his wife both testified that they set two or three mouse traps to catch mice. Defendant himself testified that the premises were satisfactory previous to the time he wrote the letter of April 16, 1931; and that around that period there were some rats in the place; that he did not know what the cause was, but that "the condition of the odors in the place was unbearable"; that between April and October, 1931, after he had written the first letter of complaint, "the conditions were such that we could not sit down in the place without having those odors. You could not sit down to a meal on account of those terrible odors. There were plenty rats. There was another condition, when I would get up in the morning those black bugs would be all through my clothes and I would pick up my shoes and shoo them off." The witness further testified that there was always an odor from the incinerator; that about eight or ten times the incinerator would be overflowing on his back porch—"it was packed, chuck full. We always called the janitor's attention to it and made complaints. . . . After the janitor would light a fire it would be disposed of."

Mrs. Isadore Holtzman, wife of defendant, testified that "the condition of the bugs just prior to the time we moved were such

that they were unbearable. . . . Well, the bugs were all over the place. We couldn't cook and we couldn't eat without seeing mice running all through the place continuously. We had traps set, trying to get rid of all these mice." The witness further stated that "the bugs were so numerous that I couldn't put on my clothes in the morning without having them in my clothes, and we would shake our clothes out, but if we forgot to do that, we would be walking around with bugs all day." When asked about the accumulation of garbage in connection with the incinerator, the witness answered: "Well, it seems when this incinerator was not burning regularly, when that condition existed, the garbage would overflow on our back porch."

From the foregoing resume of the evidence, it is clear that there was ample evidence to support the finding of facts made by the trial court with respect to the conditions complained of by defendant and the cause thereof. It is true the testimony introduced on behalf of plaintiff was in direct conflict with that adduced by defendant, but it most certainly cannot be said that there was no evidence to support the finding made by the circuit court. The evidence was ample to support said finding. The matter of weighing the evidence and passing upon the credibility of the witnesses was a matter for the trial court sitting as a jury. An appellate court will not weigh the evidence to determine where the greater weight lies. Before an appellate court is authorized to interfere on the ground of insufficient evidence, it must appear that there was no substantial evidence to support the verdict of a jury, or, as in this case, the finding of the trial court sitting as a jury. [Bachman v. Ry. Co., 310 Mo. 48, 274 S. W. 764.] It has further been held that an appellate court is not authorized to find facts and interfere with the trial court's general judgment if there was any substantial evidence, even though slight, to sustain the trial court's finding. [Glaze, et al. ex rel. Board of Supervisors of Harrison County Drainage Dist. v. Shumard et al., 237 Mo. App. 434, 54 S. W. (2d) 726.]

The general rule on the question involved in the case at bar, is stated in 36 C. J., section 993, p. 266, as follows:

"A tenant may be constructively evicted by the conduct of the landlord in creating or permitting the existence of nuisances in or about the demised premises, provided the nuisance is of a serious character and so intolerable as to interfere with the use and beneficial enjoyment of the premises. To constitute an eviction, however, the landlord must in some way be responsible for the existence of the nuisance. . . . The presence of vermin in or about the leased premises in such numbers as to render them untenantable may constitute a constructive eviction."

In Streep v. Simpson, 80 Misc. Rep. 666, 141 N. Y. S. 863, it was held that, where a flat in an apartment house was infested with

bed bugs without the fault of the tenant but due to the conditions existing in another flat, and the bed bugs were so numerous as to cause the greatest discomfort and distress to the tenant and his family, there was a constructive eviction, and the tenant abandoning the premises was held not liable for the rent.

In Batterman v. Levenson, 102 Misc. Rep. 92, 168 N. Y. S. 197, it was held that the presence of rats in large numbers in a building rented to several tenants, control of the lower part being retained by the landlord, may constitute such a nuisance as to justify a tenant in abandoning the premises even though there was no direct proof that the rats came from or through a part of the building under the landlord's control.

In Dalamater v. Foreman et al., 239 N. W. 148, the Supreme Court of Minnesota held that, in the absence of a contrary provision in the lease of an apartment in a multiple apartment building, the landlord impliedly covenanted that the premises would be habitable. It was also held in that case that bed bugs coming in great numbers into the apartment from sources under the landlord's control may constitute a constructive eviction justifying the tenant in vacating the premises.

Plaintiff cites a number of cases, prominent amongst which is Jacobs v. Morand, 59 Misc. Rep. 200, 110 N. Y. S. 208, in which it was held that, in the absence of a covenant in a lease of an apartment to keep it free from vermin, and in the absence of fraud or wrongdoing on the part of the lessor, the lessee runs the risk of the condition of the property, and hence the presence of water bugs and bed bugs in a leased apartment did not constitute an eviction of the tenant so as to justify an abandonment of the premises by him. The Jacobs case was quite different in its facts from the case at bar. As pointed out in the later case of Streep v. Simpson, 80 Misc. Rep. 666, 141 N. Y. S. 863, the Jacobs case dealt only with the presence of water bugs and bed bugs, whereas, in the case at bar, there is evidence of large black bugs in such numbers as to be unbearable, coupled with an intolerable odor from a garbage incinerator, added to which was the presence of dead mice in between the walls, and the overflowing of garbage from the incinerator onto the defendant's back porch. Furthermore, we think the sounder and more modern view on this question was expressed in Barnard Realty Co. v. Bonwit, 155 App. Div. 182, 139 N. Y. S. 1051, where the court, referring to the city of New York, said:

"Very large numbers of people live in tenement houses, apartment houses and apartment hotels in this city. Such tenants have, and can have, control only of the inside of their own limited demised premises. Conditions unknown to the ancient common law are thus created. This requires elasticity in the application of the principles thereof. An intolerable condition which the tenant neither causes

nor can remedy seems to me warrants the application of the doctrine of constructive eviction. The rule in Jacobs v. Morand (*supra*), in regard to bugs and ants within the apartment, which can be dealt with by the tenant by processes known to all housewives, should not be extended to cover offensive and unbearable nuisances outside of the apartment.''

In the above case, the court further said that the tenant and his family ''ought not to be compelled to pay rent for an apartment in which they could not live.''

Smith v. Greenstone (Mo. App.), 208 S. W. 628, was a suit for rent of premises in which the defendant admitted the lease and the failure to pay the rent sued for, but set up a constructive eviction similar to defendant's plea in the case at bar. There was a verdict for defendant, and the plaintiff therein appealed. The appellate court held that the landlord's failure to repair a water closet in the premises, over which he retained control, so that water and filth leaked into the premises demised, amounted to a constructive eviction. It is true the judgment therein in favor of defendant was reversed and the cause remanded because of an improper instruction given, but, with respect to the issue of constructive eviction, the court pointed out that the landlord had undertaken to repair the toilet and remove the nuisance but had failed to do so. The court said:

''Hence the possession of the tenant was disturbed by an agency under the control of the landlord and for which he was responsible. He was therefore injuriously interfering with the tenant's possession, in violation of his implied covenant created by the lease, and upon the tenant's quiet, peaceable, and undisturbed possession depends the landlord's right to demand rent. . . . There is no question but that the landlord's wrongful act or omission of duty was sufficient to constitute a constructive eviction, since it was sufficient to render the premises untenantable for the purposes for which the tenant leased them.'' [Smith v. Greenstone, *supra,* l. c. 630.]

In Vromania Apartments Co. v. Goodman, 145 Mo. App. 653, 123 S. W. 543, which was an action for recovery of rent of premises brought by a landlord against a tenant, there was a verdict in favor of the tenant. On appeal by the landlord, this court held:

''It was not necessary for the plaster actually to menace the safety and lives of the family. If it was in such bad order as to interfere seriously and permanently with the use of the premises as a place of residence, there was an eviction. Judgment in favor of defendant affirmed.''

We deem it unnecessary to review the various cases cited by plaintiff herein, for we are satisfied that the evidence in the case at bar was amply sufficient to warrant the finding of the trial court that

the demised premises were so infested with vermin during the period of the lease, and to such an extent, as to deprive defendant and his family of the beneficial use and enjoyment thereof; and that the plaintiff, as landlord, was responsible for said condition because of his neglect to have the garbarge in the incinerator properly consumed, which undoubtedly was the direct reason for the presence of vermin in the apartment in such great numbers. We believe that such conditions, which the landlord failed to remedy although requested to do so, constituted a constructive eviction of defendant. We believe that no reasonable person could read the evidence in this record without reaching the conclusion that the conditions in and around defendant's apartment were intolerable and unbearable. He had made written and oral complaints to the landlord and to the landlord's agent, with requests to remedy said conditions, but to no avail, and was finally compelled to move from the apartment. Under the authorities which we have cited, defendant was justified in so moving.

Plaintiff contends that the action of the court in taxing the costs against it was erroneous; and that the finding of the court that defendant made a tender in the sum of $93.50 to plaintiff, as rent for the period September 3, 1931 to October 6, 1931, is without support in the evidence. The adjudgment of the costs against plaintiff, although he was the prevailing party in the circuit court, was, of course, based on the court's finding that defendant had made a tender to plaintiff of the amount mentioned. We find no evidence whatsoever in the record to support the finding that defendant made a tender of any amount to the plaintiff, or that he tendered any amount into court for plaintiff's use and benefit. It is true there is an allegation in defendant's answer that "defendant hereby tenders into this court the said sum of $93.50 for the benefit of the plaintiff," but there is no evidence whatsoever to show that any sum was actually offered to plaintiff or deposited in court. Defendant, in his brief, makes the statement that when this case was first tried in the justice of the peace court, plaintiff's counsel entered into an oral agreement with defendant's counsel that it would not be necessary for defendant to deposit the sum of $93.50 in court in order to constitute a tender, and that it was mutually agreed that said sum would be held by defendant until such time as a final judgment was entered in the case. In plaintiff's reply brief, counsel for plaintiff emphatically deny that any such agreement with respect to tender was ever made. There is nothing in the record to show any such agreement between the parties or their counsel. We, therefore, have before us only the assertion by counsel on one side that such an agreement as to tender was made, and an emphatic denial thereof by counsel on the other side. Both statements of counsel are outside the record. It is sufficient to say that this court must

base its conclusions and action solely upon matters appearing in the record. Matters of this kind should be taken care of by counsel by way of written stipulations filed in court, or stated into the record in the presence of each other and of the court to avoid such a situation as is presented here. An appellate court cannot take notice of any such alleged agreement asserted by counsel for one side when there is no evidence in the record to prove it, and the other side flatly states there was no such agreement.

A mere offer to pay money into court in a law case does not constitute a tender under the law. In Amber v. Davis, 221 Mo. App. 448, 282 S. W. 459, the court said:

"There is no evidence that any money was ever paid into court. This being a law case, their mere offer to do equity is not sufficient. [Whelan v. Reilly, 61 Mo. 565, 569; Pauley v. Business Men's Assurance Co. (Mo. App.), 261 S. W. 340, 342, 343.]"

It will be recalled that the judgment of the justice of the peace in favor of defendant was reversed on appeal to the circuit court. The judgment of the justice was in favor of defendant against plaintiff, whereas the judgment of the circuit court was in favor of plaintiff and against defendant in the sum of $93.50; and was also in favor of plaintiff on defendant's counterclaim. Plaintiff was, therefore, the prevailing party in the circuit court upon appeal from the justice court.

In section 1250, Revised Statutes of Missouri, 1929 (Mo. Stat. Ann., šec. 1250, pp. 1473, 1474), which provides for an adjustment of costs on appeal from a justice of the peace court in various cases, there is a provision that, if the judgment of the justice of the peace court be reversed and the judgment of the appellate court (circuit court) be in favor of the appellant, the appellee shall pay costs in both courts. We think that statute applies to the case at bar, and, since we have found that there was no lawful tender made by defendant to plaintiff, and no deposit made by defendant in court for plaintiff's benefit, we hold that the court erred in adjudging the costs against plaintiff:

The judgment of the circuit court is, therefore, affirmed as to the amount of $93.50 found in favor of plaintiff and against defendant, to which the circuit court is hereby directed to add interest on the judgment for said amount from May 12, 1932, the date of the institution of the suit. As to the costs, the judgment is reversed, and the cause remanded, with directions to the circuit court, to adjudge costs in the justice of the peace court as well as in the circuit court against defendant. *Hostetter, P. J.*, and *Becker, J.*, concur.