Plaintiff sued to recover an alleged balance of demurrage charges on six carloads of hay shipped by defendant from Kansas City, Missouri, to Billings, Montana.
The principal facts out of which the controversy arose are set forth in a stipulation filed by the parties from which it appears:
That on or about May 11, 1920, defendant delivered to plaintiff at Kansas City, Missouri, six carloads of hay for transportation to Billings; plaintiff issued to defendant its several order bills of lading covering said shipment, by which said six cars were consigned to defendant's order at Billings, "notify W.H. McCormick." Copies of the bills of lading were agreed to and attached to the stipulation. It was further agreed that the reasonable value of the hay at the time of its arrival at destination was $31 per ton delivered, and after deducting freight the net value of each car was the amount of the respective drafts drawn by defendant and attached to said bills; that defendant prior to the arrival of said cars at Billings attached the original bills of lading to drafts drawn on W.H. McCormick, endorsed the bills of lading in blank and delivered the same with the drafts to the Inter-State National Bank of Kansas City, Missouri, received from said bank the amounts of said several drafts, and the bank thereupon became the owner and holder of said drafts and bills of lading and entitled to the proceeds of the drafts or to the contents of said cars; that plaintiff did not know of these facts at the time of their occurrence; that said cars were transported by plaintiff to their destination and arrived at Billings on different days from May 27th, to June 2nd inclusive, and after arrival of each car W.H. McCormick was notified personally of said arrival by plaintiff's agent; that the said McCormick upon being notified did not refuse said cars, but led plaintiff's agent to believe that he would accept them. The Inter-State National Bank sent the drafts and bills of lading to the Merchants National Bank at Billings for collection. The latter bank presented the drafts to McCormick for payment, but payment was not made. Thereafter, about June 5, 1920, McCormick filed a suit in the District Court of Billings, Montana, against the Gateway Hay Company, a corporation, and in aid thereof filed an affidavit and bond for an injunction, as a result of which an injunction order was issued by said court and served on plaintiff that day; copies of the petition, affidavit, bond and order in said suit are attached to the stipulation as exhibits. On June 7th, plaintiff's local agent at Kansas City, gave defendant by telephone message the first notice he had received that McCormick had not *Page 738 
accepted the hay and of the suit filed by him. This information was confirmed by a letter dated June 8, 1920, and received by defendant the next day; that said injunction order was obtained and plaintiff enjoined from delivering said cars without impounding the bills of lading, which were at that time in possession of the Merchants National Bank of Billings; that on June 8th, demand was made on plaintiff and the other parties to the injunction order for delivery of said six cars of hay, which demand was accompanied by an offer to pay the then accrued legal charges and to surrender the original bills of lading, but delivery was refused on the ground of the then existing injunction order. On June 10th, the Inter-State National Bank filed its interplea in an effort to dissolve the injunction and plaintiff McCormick resisted this successfully. Thereafter, on June 23rd, McCormick voluntarily obtained an order dissolving said injunction; that on June 24th, at ten o'clock A.M., plaintiff was notified of the dissolution of said injunction order and thereupon immediately requested McCormick to take delivery of the hay, which was refused by him; thereafter plaintiff immediately made verbal request on defendant to furnish disposition of said hay, but defendant refused to furnish disposition or take delivery unless the demurrage charges assessed by plaintiff to June 24th, claimed by defendant to be illegal, were waived by plaintiff, which plaintiff refused to do. Defendant made a like refusal on June 29th. The charges assessed by plaintiff for freight and demurrage are shown by an exhibit attached. It is admitted that the freight charges are correct and that the rates of said demurrage charges are correct, although it is not admitted that the demurrage charges were assessed for the correct number of days. Thereafter plaintiff sold said six cars of hay, about July 2nd, for the sum of $646, after compliance with the tariff provisions regarding sale of freight for unpaid charges. The sum realized was applied by plaintiff to the payment of charges assessed, and the present suit is for recovery of an additional sum of $578.04, the balance claimed to be due on said charges.
It was further agreed that defendant was compelled to and did reimburse the Inter-State National Bank of Kansas City in connection with said drafts in the sum of $1428.46, and received from said bank the original drafts and bills of lading, which said amount he seeks to recover on counterclaim from plaintiff in this suit; that at the time of the refusal of McCormick to pay said drafts and up to June 9th, said hay could have been resold at Billings for a price equal to the amounts of said drafts, plus freight, but subsequent thereto a depreciation in the market value of hay occurred and at the time the injunction was dissolved said hay was then only reasonably worth the amount which plaintiff afterwards realized at the *Page 739 
sale. It is agreed that defendant is the right party defendant upon plaintiff's alleged cause of action, and that if any cause of action exists in favor of defendant from the facts set forth, it is agreed that plaintiff is the party liable therefor.
It was agreed that either party might offer additional evidence not in conflict with the agreed facts, and that the statutes and decisions of the State of Montana and particularly the decision of the Supreme Court of Montana in the case of Inter-State National Bank v. McCormick, reported in 214 P. 949, might be considered by the court with the same effect as if set forth in the pleadings, and offered in evidence. To the stipulation was attached a number of exhibits including the bills of lading, the drafts attached thereto, petition in the case of McCormick v. Gateway Hay Company, the affidavit for injunction, injunction bond, the order of injunction, petition and motion of Inter-State National Bank to dissolve the injunction, order on said petition that McCormick show cause why the injunction should not be dissolved, McCormick's request for a dissolution of the injunction, the order dissolving the injunction, exhibit showing freight and demurrage charges due on each car, and the demurrage tariff known as "Agent J.E. Fairbanks No. 4."
It was further shown by oral testimony that the Gateway Hay Company made its adjustment with the Inter-State National Bank on account of the amount involved in the drafts on September 13, 1923, and its actual amount of loss determined at that time. The Inter-State National Bank sued McCormick in the Montana courts and by final judgment in the Supreme Court of that state recovered and collected a net amount thereon of $773. The basis of that suit was the damage, including demurrage, caused by McCormick in procuring the injunction order and tying up the cars of hay. The amount received by the bank was credited to the amount which it had advanced to defendant on the drafts and defendant was charged with the difference.
A memorandum showing the various dates of arrival, and dates of notice, and the various days subsequent to the arrival of each car for the purpose of showing Sundays excluded under the terms of the tariff, and the days from which demurrage would properly start, and the date for which an unclaimed notice should be had under the tariff was offered in evidence. Plaintiff also offered in evidence copies of the complaint, answer, judgment, and decision of the Supreme Court of Montana in the case of Inter-State National Bank v. W.H. McCormick.
The petition charged the appropriate facts of having received the hay for shipment, notification of its arrival, tender to McCormick, his refusal to accept, notification to defendant, the injunction order, dissolving of same, further request for disposition of the hay, defendant's *Page 740 
refusal, sale of the hay, and application of the proceeds to the charges accrued; that the total freight charges accruing and the legal tariff was the sum of $551.45, and that in addition thereto the sum of $653 and $19.59 war tax accruing for car service at Billings, according to the lawful tariff, making a total of $1224.04. That the sum of $646 was obtained from the sale of hay and applied on the charges leaving a balance of $578.04 due and owing; demand for payment was made upon defendant and payment refused. Plaintiff prayed judgment for the sum claimed with six per cent interest from May 11, 1920. This petition was filed May 8, 1922.
On July 21, 1925, by leave of court, defendant filed its amended answer and counterclaim in which it made general denial; and a further answer by way of counterclaim set up the facts in reference to the shipment of the hay, the duty of plaintiff to deliver same to defendant or its order upon surrender of the original bills of lading, and on payment of the legal and published tariff and freight charges; the issuance of its drafts, the sale thereof to the Inter-State National Bank, the institution of the McCormick suit, and without impounding the bills of lading aforesaid McCormick procured from said court an order purporting to enjoin plaintiff and others from removing the hay; that none of said parties so enjoined were parties to said suit; that thereafter about June 8, 1920, demand was made upon plaintiff for the delivery of the cars of hay by the holder of the bills of lading, and that plaintiff contrary to its duty as a common carrier and in violation of the terms of the bills of lading failed and refused to surrender said cars. The dissolution of the injunction order is further recited, and a further demand upon plaintiff for the delivery of the cars which plaintiff refused unless payment of charges in excess of the legal and published rate was made; that defendant was compelled to and did reimburse the Inter-State National Bank in the sum of $1428.46, and that defendant is now the holder of said original bills of lading; that if plaintiff had delivered said cars there would and could have been realized from the sale a sum sufficient to reimburse said Inter-State National Bank for the amount paid by it to defendant. The injunctive order served on plaintiff is alleged to have been void, of no effect, and the failure and refusal of said plaintiff to deliver said cars of hay resulted in damage to defendant in the sum named, for which he demanded judgment against plaintiff.
The cause was submitted to the court without a jury. The court found the issues in favor of the plaintiff and against the defendant, rendered judgment for plaintiff in the sum of $578.04, with interest at six per cent from May 11, 1920, and for plaintiff on the counterclaim. At the request of plaintiff, the court gave the following declarations of law: *Page 741 
"1. The court declares the law to be that defendant is entitled to recover nothing on his counterclaim."
"2. The court declares the law to be that under the pleadings and the evidence in this case, plaintiff is entitled to recover the amount of freight and demurrage charges as prayed for in its petition."
The court also gave the following declaration at defendant's request:
"The court declare the law to be that it was the duty of plaintiff, upon tender of the legal charges incurred, accompanied by an offer to surrender the original shippers order bills of lading covering the cars in question, to make delivery of said cars to the holder of said bills of lading, and the failure of plaintiff so to do renders it liable to defendant for the resulting damage, being the amount defendant repaid to the Interstate National Bank, unless plaintiff excuses such failure by showing that the injunction order was valid on its face, and that the bills of lading had been impounded."
The court also declared that the counterclaim was not barred by limitation. Other declarations in accord with defendant's theory were refused.
 OPINION.
The points made and urged by appellant are (1) the carrier was bound to deliver on demand and was not excused by the injunction order, (2) the injunction order was void because the action was prohibited by the laws of the United States (See. 8604, 1 U.S. Compiled Statutes 1918), contrary to the Montana laws, and because the railroad company was not a party to the action, (3) the demurrage charges are improperly assessed and are excessive. The respondent counters with the propositions that the injunction order justified the refusal of the carrier to deliver when demand was made on June 8th; that the carrier was not bound to contest the injunction order which was valid on its face; that it was bound to obey the injunction order; that the action was not prohibited by the laws of the United States; was authorized by the laws of Montana; that it was not necessary that the carrier be a party to the action; that the demurrage charges were properly assessed and due, and defendant's counterclaim is not well founded.
The whole controversy centers upon the question as to whether or not the injunction order issued and served upon the railroad company constituted a "lawful excuse" for its refusal to deliver the hay upon an offer made to pay the charges then due and surrender the bills of lading.
It is in effect contended by appellant that it was the duty of the railroad company to disregard and disobey the injunction order, or procure its dissolution, because the injunction order was void, and *Page 742 
that the injunction order did not constitute such vis major as to excuse the railroad company from its express obligation to deliver the property on demand. It is contended that an injunction order is included within the terms of section 8604, 1 U.S. Compiled Statutes 1918, and was prohibited, and that inasmuch as the bills of lading were not impounded the injunction order was void, and being void could have been disobeyed with impunity. We are not impressed favorably with this argument. We are not ready to say that an injunctive process is contemplated or included within the terms of section 8604, 1, nor do we consider it necessary to determine this question on account of conclusions hereinafter reached on other questions. However, the courts would certainly hesitate to extend the terms of the statute beyond its expressed terms and its necessarily implied purposes. The section provides:
"If goods are delivered to a carrier by the owner or by a person whose act in conveying the title to them to a purchaser for value in good faith would bind the owner, and an order bill is issued for them, they cannot thereafter, while in the possession of the carrier, be attached by garnishment or otherwise or be levied upon under an execution unless the bill be first surrendered to the carrier or its negotiation enjoined. The carrier shall in no such case be compelled to deliver the actual possession of the goods until the bill is surrendered to him or impounded by the court."
We cannot agree with appellant that "the statute was passed to meet all phases of interference" and covers injunction or any process which seeks to interfere with the rights of a holder of a bill of lading. The authorities cited by appellant are not persuasive on this point. He quotes from the dissenting opinion in the case of Salant v. Penn. R. Co., 177 N.Y.S. 475, l.c. 480, and also cites Brimberg v. Hartenfeld Co., 105 A. 68, l.c. 69. The latter case was decided more particularly upon the terms of the New Jersey statute which includes the term "enjoined." All that appellant says goes to the point that as a matter of law the injunction order was not an effective restraint because it was an unlawful order. It is contended that it was unlawful for various reasons as indicated above, but we have been led to the conclusion that the railroad company under the circumstances in this case was not compelled to decide that question at its peril, but that it was legally justified in obeying the process of the court which was regular upon its face.
The injunction order issued by the judge of the District Court of the State of Montana in the county of Yellowstone, and served upon the railroad company by the sheriff, contained the following order:
"Now therefore, it is ordered that until further order of this court the defendant, Gateway Hay Company, a corporation, the Northern Pacific Railway Company, a corporation, the Chicago, Burlington *Page 743 
Quincy Railway Company, a corporation, its agents servants and employees, and especially F.B. Mitchell, joint freight agent of both of said railroad companies, do absolutely desist and refrain from removing, transporting, or in any manner disposing of said hay, which is more particularly described in car numbers hereto attached, until the further order of this court."
The order further recited the essential facts and made the finding that it was a "proper case for an injunction." There is no question raised against this order on the ground that it did not emanate from proper authority and a court of general jurisdiction. When such an order is served upon a citizen, and being regular upon its face, what other or different course would be expected or required than that of obedience? No other procedure could achieve legal order. A position of resistance and defiance of duly constituted authority could achieve only disorder and chaos. We cannot conceive that a person receiving an injunction order must, at his peril, carry the burden of showing that his obedience to the order was justified by the validity of the order and that said order could not be dissolved.
We hold that while the injunction order was in effect the railroad company had a lawful excuse for its failure to deliver the hay on June 8th, when demand was made therefor. It was the duty of the railroad company to notify the shipper or the owner of the goods of what had transpired, but it was not its duty and obligation to question the regularity and validity of the injunction order, enter itself as a party to the injunction suit, and seek a dissolution thereof, although it may have done so. The bank, owner of the bills of lading and the goods, sought relief by way of petition and motion to dissolve the order and its effort was futile. If the real party in interest could not succeed in obtaining a further or different order of court at the time, what measure of success could the bailee or railroad company hope to have in a like undertaking?
The fact that demurrage charges for car service were accumulating during the pendency of the injunction order was not the fault of the railroad company, and we are firmly of the opinion that the process initiated and had in this case resulting in the mandatory order served upon the railroad company and coming from the judicial department of a sovereign state was the intervention of such vis major as to relieve the common carrier from its strict obligations as such. It was an act of the law, the sovereign, or the State that interposed to prevent the timely completion of the carrier's duty in the usual course, and this was a lawful excuse for the carrier. Whether the injunction order was improvidently or unlawfully issued was a question to be determined by the proper judicial authorities and not by theipse dixit of the party enjoined. No other procedure would comport with due process of law. *Page 744 
Some of the authorities cited by appellant and stressed in his brief are the following: Dermott v. Jones, 2 Wall. 1, 17 L.Ed. 762; Peckham v. Securities Co., 113 A. 799, 802; Klauber v. Car Co., 30 P. 555; So. Memphis Land Co. v. McLean, 179 F. 417, 102 C.C.A. 563. These authorities lend color and support to his argument that the railroad company could not set up the plea of excuse unless it showed that the injunction relied upon made performance impossible, and if the company could have secured a dissolution of the injunction it did not make performance of its contract impossible within the meaning of the law, and that it should appear that an effort was made to dissolve the injunction or that such an effort would have been futile.
The Klauber case, supra, also lends support to the suggestion that a writ sued out by a private litigant will not excuse performance of a contract, although it may deprive the contractor of the means of performance; that it is not so prevented by operation of law, but is the act of an individual and not of the government. The weight to be attached to what is said in these cases must be measured by the facts and issues held in judgment. They were not carrier cases, but questions involving obligations on contracts and in most of which it appeared that performance was not rendered impossible, notwithstanding the injunction then operative. But whatever weight should be accorded them, we are more inclined to adopt and follow lines of reasoning and a course of conduct other than that insisted upon by appellant, and as indicated in such cases as Jewett v. Olson, 18 Or. 419, 23 P. 262; Pingree v. Detroit, etc., Northern R. Co., 66 Mich. 143, l.c. 145, 33 N.W. 298; McAlister v. Chicago, Rock Island 
Pacific Ry. Co., 74 Mo. 351, l.c. 363-4; Pecos Valley Trading Co. v. Atchison, T. S.F. Ry. Co., 24 N.M. 480, 485, 174 P. 736; Whittemore v. Sills, 76 Mo. App. 248, 255-6; and particularly the learned discussion and review of authorities by Judge TRIMBLE in the case of Danciger et al. v. Atchison, T. S.F. Ry. Co., 179 S.W. 800, 802-3. Space does not permit, nor does occasion require, a detailed examination of these cases or others. However, we quote briefly from some of them. In the Jewett case, supra:
"When property is in the hands of a carrier for transportation, and in the course of transit is seized upon legal process sued out against the owner of the property, and taken out of the carrier's possession, such property is placed in the custody of the law, and is so placed by a superior power, the power of the State, and excuses the carrier from liability for not delivering the goods."
And this from the Pingree case, supra:
"Whatever may be a carrier's duty to resist a forcible seizure without process, he cannot be compelled to assume that regular process is illegal, and to accept all the consequence of resisting officers *Page 745 
of the law. If he is excusable for yielding to a public enemy, he cannot be at fault for yielding to actual authority what he may yield to usurped authority."
And in the McAlister case, supra, from our own State:
"It is not sued for improperly surrendering the cattle to an officer under void process. And if it was the writ, if not void on its face, would justify the officer and protect the defendant in surrendering the cattle thereunder. It is not charged that the writ was invalid upon its face. The defendant was not bound to know that the law, under which the proceedings were had, was unconstitutional. . . .
"But in any event, whether the law be valid or invalid, the damages in question were the direct result of said legal proceedings instituted and carried out by third parties, who were entire strangers to the defendant, and for whose acts and doings, whether right or wrong, it is in no way responsible. In no event was the unloading of said cattle the proximate or necessary cause of said loss. The defendant was not bound to anticipate or apprehend that such proceedings, whether right or wrong, would be instituted, and the damages so resulting are too remote to be chargeable on the defendant."
We could quote appropriately, at length, and with profit from the Danciger case, supra, but shall state only briefly some of the conclusions therein reached. In discussing the liability of the carrier and the strict rule generally applied, the court remarks:
"But this stringent rule has been modified so as to excuse the carrier from liability where the goods have been taken from his possession by process of law, provided the carrier gives prompt notice of such seizure to his bailor."
And after seizure of goods by the sheriff it is said:
"The right of the sheriff to hold them was a question of law, to be determined by the proper legal proceedings and not at the will of the defendant, nor that of the plaintiffs."
And further:
"So that the old common law rule that nothing save an act of God or the public enemy can excuse a carrier for failure to deliver goods intrusted to it for carriage, is not without exception. And that rule has been modified, at least to this extent, that when goods in a carrier's possession have been seized, the carrier will not be liable where: First, there has been no fraud, collusion, consent, or connivance on the part of the carrier; second, where the seizure was made by an officer of the law acting under authority apparently valid on its face; third, that the carrier gave notice to the consignor — this last being for the purpose of enabling him to protect his own interest." *Page 746 
And in reference to the duty of the carrier to determine questions of law, it is said:
"Neither was the agent required to resist the officer and attempt to himself decide the question of law presented. . . . The power of the United States officer, and his determination to take the liquor under authority vested in him by government, was, under such circumstances, the highest form of vis major and, unless it was the agent's duty to resist the officer, the defendant should not be held liable. In many analogous cases it is held that, even where the officer has apparent authority, he should not be resisted, and this seems to be consonant with law and order and with established forms of government."
This case reviews many authorities on the question of the seizure of goods in possession of a carrier, and the duty of the carrier under such circumstances. We believe that every argument of appellant is met and overcome by the reasoning of this case, and that it is a correct interpretation of the legal rules applied in the State of Missouri. It matters not whether the goods are "seized" in the hands of the carrier or whether the disposition of the goods by the carrier is enjoined. We think that the rules applicable to the situation of a seizure apply equally to the case of an injunction. Under the circumstances in this case, we cannot conceive of any other reasonable conclusion than that the railroad company was justified by way of lawful excuse in refusing to deliver the property after it was enjoined, and while the injunctive order was still in effect. We hold to this conclusion notwithstanding the insistence of appellant that the injunction was not procured in strict accordance with the provisions of the laws of Montana and that the railroad company was not a party to the action. Under the circumstances, obedience to the order of court was the only appropriate response and said order was an effective restraint. The company could not be expected to fly in the face of authority, disobey the injunction, take the hazard of contempt, or test the validity of the order made for the benefit of others, merely because the consignor of goods, or the holder of the bill of lading, demands possession. The carrier could not be required to defend the lawsuit of the shipper.
The conclusion upon this phase of the case necessarily disposes of the matter of defendant's right to counterclaim, adversely to defendant. The loss was suffered on account of delay occasioned by the injunction. If the plaintiff was justified (and we find it was) under the injunctive order to refuse delivery, and defendant as a consequence sustained loss in the depreciation of the property and accumulating charges, it was damnum absque injuria
in reference to plaintiff. Other matters urged by respondent against the counterclaim need not be considered or determined. However, we are also *Page 747 
of opinion that the suit instituted and prosecuted by the Inter-State National Bank against McCormick, 214 P. 955, precludes defendant from right of counterclaim in this case. The complaint in the suit of the Inter-State National Bank was to recover not only the value of the hay, but also alleged that plaintiff had become liable for the payment of freight charges and demurrage in the sum of $1219.88, and sought a recovery for same. The bank was the owner of the bills of lading and the sole owner at that time of the cause of action on account of the total loss occasioned by the injunction. The bank sued McCormick alone and thereby elected its remedy. The judgment was, in legal contemplation, the measure of the damage sustained, although insufficient in amount to compensate for the total loss. It appears that the judgment became final and was paid and that the matter of total damages arising out of the injunctive process, including the subject-matter asserted in defendant's counterclaim, has been determined and adjudged. The bank credited the amount collected on its judgment upon the drafts purchased from defendant and collected the remainder from the defendant. It appears to us that the defendant in this case is bound by the election of remedy made by the bank in its suit for the total damages, but however that may be we place our conclusion and ruling in this case upon the ground heretofore indicated.
It appears that the court gave inconsistent declarations of law. In declaration 2 given at the request of plaintiff, the court declared that under the pleadings and the evidence plaintiff was entitled to recover the amount of freight and demurrage charges as prayed for in its petition. And by declaration 2 given at the request of defendant the court, in effect, declared the law to be that it was the duty of plaintiff to make delivery of the cars to the holder of the bills of lading upon tender of legal charges and an offer to surrender the bills, and that the failure of plaintiff so to do rendered it liable to defendant for the resulting damage, unless plaintiff excusessuch failure by showing that the injunction order was valid onits face and that the bills of lading had been impounded.
There was no showing in this case that the bills of lading had been impounded and it was in fact agreed that they were not impounded. If the court reached the correct conclusion and found for the right party, we see no harm in its making an erroneous declaration of law.
Appellant further insists that the demurrage charges assessed against him and for which he is sued in this case were improperly estimated and the judgment is excessive. Upon a careful examination of the estimate of the demurrage charges and of the days for which charge is made, and the days which should be included and excluded under the tariff schedule, we have reached the conclusion that the judgment is excessive and if not corrected by a remittitur should be reversed. *Page 748 
Under the demurrage tariff introduced in evidence and upon which computation should be made in counting time, Sundays and holidays are to be excluded, and time is to be computed from the first 7:00 A.M. after the day on which notice of arrival is sent or given to the consignee. When freight is unclaimed within five days from the first 7:00 A.M., after the day on which notice of arrival has been given, a notice to that effect shall be sent by wire to the shipper that the property is unclaimed. This duty of the carrier must be performed before demurrage can be assessed. One day after notice of arrival to consignee is free time. After that, demurrage is assessed at $2 per day for four days and $5 per day thereafter, Sundays and holidays excluded. In case of failure by the railroad to send notice in accordance with the provisions of the rule, the consignee would not be held liable for demurrage charges between the date notice should have been sent and the date it was actually given.
Appellant contends that under the rules he was entitled to notification "by wire" and that no such notice was ever given. However, the agreed statement of facts shows that he received notice by telephone on June 7th, confirmed by letter of June 8th, received by defendant on June 9th. This was the first notice of any character that defendant had received. More than five days had elapsed and demurrage charges were assessed for time before any notice was given. If defendant had actual notice, as he agreed he had, we do not agree with the contention that he must have notice "by wire" before demurrage charges would attach. The bank had actual notice on June 8th, when demand for delivery was made. We do think, however, and hold that for the period of time which elapsed after five days and until notice was actually given, plaintiff had no right to assess demurrage charges for that time. Plaintiff claimed and the court allowed the full charges of demurrage fixed by the rules from the date of arrival of the cars; regardless of the time when notice was given defendant that they were unclaimed. We find the excess charges to be as follows: On car DLW, arrived May 29th, the next day was Sunday and demurrage would start May 31st at 7:00 A.M.; notice that it was unclaimed was due to be given June 5th, and for the same reason notice was due on car Sou. June 4th, and on car LV, June 3rd, and on car MP, June 3rd. From these respective dates until June 8th, there was no demurrage properly chargeable. It results that there was a total excess charge for demurrage of three days on one car, four days on one car, five days each on two cars, which makes a total of seventeen days of excess charge at $5 per day or the sum of $85. We think there should be aremittitur of that amount plus accrued interest on said sum at six per cent from May 11, 1920, this because the court rendered judgment for the sum demanded in the petition plus interest from May *Page 749 
11, 1920, and unless such remittitur be made the judgment should be reversed and the cause remanded.
From the conclusions reached the judgment should be affirmed on condition that plaintiff within ten days hereafter remit from its said judgment an amount equal to the sum of $85, plus interest at the rate of six per cent thereon from May 11, 1920, and in event of its failure so to do that the judgment be reversed and the cause remanded. The Commissioner so recommends. Barnett, C.,
concurs.