Michael R. McDERMOTT and Johanna M. Clay, Plaintiffs/Appellants,

v.

Carl BURPO, Susan Burpo, John Haskins and Irene Haskins, Defendants/Respondents.

No. WD 33743.

Missouri Court of Appeals, Western District.

Oct. 25, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Dec. 28, 1983.

Application to Transfer Denied Feb. 15, 1984.

Craig A. Smith, Columbia, for plaintiffs/appellants.

Stephen C. Scott, Columbia, for defendants/respondents.

Before DIXON, P.J., and KENNEDY and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

In this court tried case, where both sides have appealed, the standard of review is under the oft-stated rule in *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976) and Rule 73.01. Review of the facts in this equitable action is in a light most favorable to the result reached. *Schimmer v. H.W. Freeman Construction Co., Inc.*, 643 S.W.2d 621, 622 (Mo.App.1982). In an attempt to bring some clarity to the matter, the plaintiffs below, McDermott and Clay, will be referred to as the Buyers, and the defendants, the Burpos and Haskins, will be designated as the Sellers.

The Buyers being desirous of building a "Georgetown" style home in Columbia, Missouri contacted a builder, Mr. Creath. Mrs. Creath operated Medallion Realty (Medallion). Medallion employed a Ms. Dorcas Miller. On July 23, 1979 the Buyers executed a contract to purchase lot 11 in Oak Cliff Subdivision, owned by the Sellers, for a price of $10,000, $500 down deposited with Medallion, as agent for the Sellers, containing a provision they would have 45 days to procure 90% financing through an FHA guaranty. The closing was to be September 5, 1979 at Medallion's offices. The Sell-

ers were to provide an abstract or title insurance within 30 days. Time was of the essence. This document will be referred to as the "real estate contract." At the same time the Buyers signed a contract with Mr. Creath to build the desired house on the lot in question for $44,000. This contract had a provision similar to the real estate contract, providing for the contingency for financing. This contract will be referred to as the construction contract.

On July 27, 1979 the real estate contract was presented to one of the Sellers, Mr. Burpo, by Miller and Mr. Creath. He made some changes in the contract, all agreed to by the Buyers, and, also, with the Buyers' later consent added that the sale of the lot was, "Subject to approval of plans by architectural committee."[1] The Sellers then signed the real estate contract. The plans of the Buyers were presented to Burpo who said he would have to check with the other committee member Haskins. He did request certain changes be made. After preparing final blueprints, the Buyers sent them through Miller and Medallion Realty to Burpo on August 22nd. Burpo, verbally, told Miller the committee had rejected the plans—Miller then relayed this information to the Buyers.

On August 24th the Buyers learned their FHA loan guaranty application was refused. Miller took the Buyers to look at some other lots on which to build.

Prior to the closing date of September 5th the Buyers told Miller they still wanted the lot in question and would pay cash rather than obtaining a loan. (The Buyers according to the terms of the contract had until September 6th, one day after closing to procure the FHA guaranty.) They told Miller they would come to the closing with cash in hand if Miller called and gave them 5 minutes notice that the Sellers were there. At that time no abstract or title commitment had been given to Sellers.

The Sellers did not appear and had listed the lot for sale on August 21st, for $11,000 and refused to convey.

Evidence was presented that the construction contract could not be honored at the original price due to inflation in construction costs, and the interest rate for any such loan had gone up.

The Buyers in Count I asked for specific performance of the real estate contract and incidental damages of $20,000 for delay in performance. Count II asked for a declaratory judgment that the final plans had been deemed approved since no written rejection had occurred. Count III asked alternatively for $3,000 in damages and return of the $500 earnest money.

The court's judgment awarded specific performance and ordered the Sellers to, by abstract or title insurance, show title marketable in fact before exchange of the warranty deed and the purchase price that had been ordered paid into court. It is from the granting of specific performance that spawned the Sellers' cross-appeal, which will be first considered in this opinion. The court gave no relief to the Buyers in their prayer for damages for increased construction and interest costs caused by the Sellers' delay, causing the Buyers to file the initial appeal. No appeal was taken from the court's granting judgment for the Sellers on Count III.

## CROSS APPEAL

### I.

The first point on the cross-appeal of the Sellers is that the real estate contract became null and void a) when Buyers did not obtain an FHA loan, a clause they had inserted into the document, and, b) when Buyers did not effectively waive this condition by not informing Sellers of the waiver. The Sellers start from the false premise

---

1. This committee was composed of Mr. Burpo and Mr. Haskins (the other two title owners being their wives). This committee was set up to approve plans for construction in the subdivision. The restrictive covenants provided that if the committee did not approve submitted plans it *should* notify in *writing* its disapproval. If plans were not approved within 10 days from submission and the party submitting the plans had not been notified in writing of the committee disapproval, the "plans shall be considered approved."

that the contract ceased to exist when the Buyers couldn't get an FHA loan. The contract was treated by Sellers as void when they determined the plans were not in compliance with the wishes of the architectural committee, (Burpo and Haskins). When they later found out from Medallion Realty the FHA loan did not go through, this seemed to re-enforce the Sellers' notion that they needed to do nothing further, so they did not procure an abstract nor a title policy and did not attend the closing.

■■■ The Sellers say there was no evidence Buyers could get an FHA or other type of loan to buy the land. This is true; however, there was evidence which the trial court could and did believe to establish the fact the Buyers were prepared to pay the $9500 balance in cash. This ability and intention to pay off the amount would obviate the need to obtain a loan, thus waiving the provision in the contract for the Buyers' benefit and certainly showing an intent to purchase the property under the existing contract. Buyers' waiver of this provision did not adversely affect the rights of the Sellers, *Campbell v. Richards,* 352 Mo. 272, 176 S.W.2d 504 (1944). *See also Huntington Mining Holdings v. Cottontail Plaza, Inc.,* 79 A.D.2d 647, 433 N.Y.S.2d 824, 825 (1980). Had they intended to use the financing clause as a means to exclude any further obligation under the contract, the Buyers would not have gone to the trouble to be ready to pay the balance on closing. The Sellers' contention that the time limitation of 45 days to get the financing could only be waived by Sellers is not well taken. This clause was for the protection of the Buyers. In this case, where the party who has the "out" can pay cash, the Seller may not use the inability to finance as a means of avoiding contractual obligations.

The Sellers' reliance upon *Doerflinger Realty Company v. Maserang,* 311 S.W.2d 123 (Mo.App.1958) is misplaced. There a loan at the agreed upon interest rate could not be procured, terminating the contract. *Doerflinger* involved a later attempt to get the loan, where here the Buyers elected to pay cash from personal sources rather than cash from a government loan they would later repay.

The trial court's reliance on *De Freitas v. Cote,* 342 Mass. 474, 174 N.E.2d 371 (1961) is well taken. There the purchaser of real estate had inserted in the contract a provision that the agreement would be terminated if he could not obtain a G.I. loan. The Buyer was allowed to waive this condition for his benefit by tendering funds from a different source.

The second prong of Sellers' argument on this point is the trial court erred in finding the Buyers had effectively waived the financing contingency. They contend the Buyers did not inform the Sellers of this waiver, and that cash would be paid upon closing. They say, "[T]he only way in which the trial court correctly could have concluded that the plaintiffs effectively communicated their waiver . . . would have been also to have found that Dorcas Miller/Medallion Realty was the agent of the defendants." They point out the trial judge found Miller and Medallion were employed by neither the Buyer or the Seller, so the Buyers telling Medallion or Miller of their intent to pay cash was no notice to an agent of Sellers. The Sellers contend Miller and Medallion to be the Buyers' agents.

What is obvious from the facts here is that Sellers considered the contract at an end when the committee did not approve the second set of blueprints. The Sellers during the week of August 21st, some two weeks prior to closing, had listed the property for sale with a service for $11,000. Burpo claimed this action was due to mistake. The listing was made prior to the time the Buyers knew their FHA loan would not come through. (Apparently the FHA policy was not to guarantee loans on unimproved lots. In addition, this subdivision had not been approved.) Burpo did say the following: ". . ., and to my knowledge, they hadn't . . . they hadn't succeeded in . . . obtaining a loan . . . ." The record is unclear how or when he obtained this knowledge, or whether it came from Dorcas Miller, Mr. Creath, or someone at Medallion,

since the Buyers and Sellers never had direct contact.

The Sellers did not within 10 days notify the Buyers in writing of their disapproval of the plans. The Sellers did unilaterally consider the matter over, and so did not prepare an abstract or provision in title policy and did not show up for the closing. From the evidence it can be inferred that once the plans were vetoed by them they considered the matter through and the item of the inability of the Buyers to obtain an FHA guaranty was only an afterthought.

▮ The Sellers cannot be heard to say the Buyers' expression to pay cash made to Miller/Medallion was not notice to them. The real estate contract refers to the $500 of earnest money deposited with Medallion, "as agent for the Seller". It further contains the provision for real estate agent's commission to be paid by the Seller. If the title proved to be defective, the Buyer was to deliver any objections to the "Seller at the office of the agent . . . ." (Medallion). The deed itself was to be delivered by the Seller, "for the Buyer at the office of said Seller's agent . . . ." The contract further provides for the earnest money deposit to be used as liquidated damages, to " . . . be divided equally between the Seller and the named agent for the Seller provided, . . . the . . . agent shall in no event receive . . . money . . . greater than . . . the agreed commission."

Although Miller/Medallion approached the Sellers with a contract signed by the Buyers, it cannot be said they were solely the agents of the Buyers; at least Miller/Medallion were dual or joint agents, a proposition that is neither new or unusual. *Whittlesey v. Spence,* 439 S.W.2d 195, 199 (Mo.App.1969).

The facts here are somewhat similar to *Thomason v. Miller,* 555 S.W.2d 685 (Mo. App.1977), although there the action sounded in fraud against an agent who concealed a necessary fact from one of his principals. This court found the agent was a dual agent and knowledge of a certain fact by the agent was imputed to both principals, but the fraud could not be imputed to the other principal. As in the case at bar, the dual capacity of the agent was done with knowledge and consent of both parties. *But see, Cox v. Bryant,* 347 S.W.2d 861, 864 (Mo.1961). The Sellers cannot escape the provisions of the signed contract and since they agreed to pay the real estate commission of 6%, they cannot claim they did not employ Medallion. *Cf. E.A. Mabes And Company v. Fishman,* 284 S.W.2d 21, 26 (Mo.App.1955); *Kohn v. Cohn,* 567 S.W.2d 441, 446 (Mo.App.1978). The knowledge of the realtor as to the decision of the Buyers to pay cash was imputable to the other principals, the Sellers. Accord, *Rainey v. Foland,* 555 S.W.2d 88, 92 (Mo.App.1977). Since this provision of the contract favoring the Buyers did not waive or affect the rights of Sellers, it was within Buyers' rights to waive. *Campbell v. Richards, supra,* at 505, *Koedding v. Slaughter,* 634 F.2d 1095, 1097 (8th Cir.1980).

▮ As has been previously stated, it would have been a useless act to tender cash or to have obtained financing since the Sellers had treated the contract as void and had already breached it by not providing an abstract or title policy within thirty days of execution of the contract. *Citizens State Bank of Nevada v. Wales,* 469 S.W.2d 750 (Mo.App.1971). As was pointed out by the trial judge, it would have been asking too much to have the Buyers tender payment until they had examined the title and found it to be marketable in fact. *See Nyder v. Champlin,* 401 Ill. 317, 81 N.E.2d 923, 926 (1948).

## II.

The other facet of the Sellers' cross-appeal is that even if the contract remained in force, "despite the failure of the financing condition," the Buyers should be denied the remedy of specific performance because they failed to make or timely make known their tender of performance. The Sellers say Buyers did not give notice of their intention to pay cash and to close on September 5th, and the Sellers "assumed the contract had fallen through . . . ." The

Sellers' argument is not persuasive. It assumes their rejection of the plans effectively voided the contract from any further tender or performance. As previously noted, the Sellers did not comply with the method of disapproval of plans as contained in the restrictive covenants.

The contract for sale of the land made September 5th the date for closing. Though not being effective as disapproval, the Sellers did not like the Buyers' plans, repudiated the contract and assumed the Buyers could not pay for the land when they learned no FHA financing could be obtained. The Sellers didn't prepare an abstract or procure a title policy. They unilaterally treated the contract as dead and didn't show up for the closing. The time for Sellers to provide the abstract or title policy to the Buyers had passed before the closing date. The Buyers would have accomplished nothing and the law does not require a useless tender in order to obtain specific performance—in this case going to Medallion's office on September 5th with the balance of the purchase price. By repudiating the contract and denying any obligation under it the Sellers placed themselves in a position that acceptance after a tender would be refused. *Blankenship v. Porter,* 479 S.W.2d 409, 413 (Mo.1972). As stated in *Cooper v. Mayer,* 312 S.W.2d 127, 130 (Mo.1958):

> "[W]here failure of a party to perform a condition is induced by a manifestation to him by the other party that he will not substantially perform his own promise, performance of such condition is waived and, therefore, excused."
>
> \*     \*     \*     \*     \*     \*
>
> "[W]hen the vendor of land claims to have rescinded, and repudiates and denies the obligation of the contract, placing himself in such a position that it appears that if tender were made its acceptance would be refused, then no tender need be made by the vendee. In such case it is enough if the latter, in a suit for specific performance, offer by his bill to bring in the money when the amount is liquidated."

A futile tender by the Buyers was excused, and they did offer to make tender at trial if specific performance was granted. *Lancaster v. Simmons,* 570 S.W.2d 742 (Mo.App. 1978).

The Sellers' related argument, without merit, is that the trial court found Dorcas Miller and Medallion to be nothing more than interlopers, thus making the Buyers' statement to Miller that they could show up with the money, if called, an ineffective notice of tender to the Sellers. The contract between the parties specifically made Medallion an agent of the Sellers, Burpo and Haskins. As signatories to the contract the defendants are presumed to know and have accepted its terms. *Cf. Sanger v. Yellow Cab Co., Inc.,* 486 S.W.2d 477, 481 (Mo. banc 1972). The Sellers' cross-appeal is ruled against them.

## INITIAL APPEAL

The Buyers claim error in the trial court's failure to award damages in addition to specific performance for the increased costs of financing and of constructing their home allegedly caused by Sellers' failure to convey title to the real estate lot on the date of closing. The Buyers' purchase of the lot and construction of their home involved two separate contracts: the first, between them and the Sellers for the purchase of Lot 11 of Oak Cliff Subdivision, the second, between the Buyers and Reid E. Creath Construction for the construction of their home. As discussed in the portion of the opinion addressing the cross-appeal, the Buyers were unable to obtain FHA financing as provided for in the financing clause of both contracts, but were willing to pay cash for the purchase of the lot. The increased costs of financing and of the construction contract relate solely to the second contract, to which the Sellers were not parties.

In *Cal-Val Construction Co., Inc. v. Mazur,* 636 S.W.2d 391 (Mo.App.1982), the Eastern District affirmed an award of specific performance of a single contract for the construction and sale of a home, allowing the nonbreaching Buyers various credits

and charges, including an offset for the increased interest rate after the Buyers lost a loan commitment due to the breach. Although *Cal-Val* stands as the first Missouri case to consider whether to compensate the non-breaching party for an increase in interest rates in addition to granting specific performance, the decision is consistent with previous Missouri cases which recognize the equity court's broad discretion to do complete justice between the parties. "These powers are broad. [The court] can do complete justice; require an accounting; establish and enforce vendor's or other liens on terms provided in the contract; adjust equities for improvements made, deterioration, rent, interest and the like ...." *State ex rel. Place v. Bland,* 353 Mo. 639, 183 S.W.2d 878, 890–891 (1944). *See also Robert Blond Meat Co. v. Eisenberg,* 273 S.W.2d 297 (Mo. 1954); *Metropolitan St. Louis Sewer District v. Zykan,* 495 S.W.2d 643 (Mo.1973).

▉ Relying upon *Ragan v. Schreffler,* 316 S.W.2d 659 (Mo.App.1958), Judge Cave denied the Buyers' claim for damages because no evidence of rents and profits derived from Lot 11 during the period of the delay in conveyance had been proven. Even though reliance upon the *Ragan* decision was misplaced, the judgment will be affirmed if the denial of the damages was nonetheless the proper result. *Chicago, B. & Q.R. Co. v. Fowler,* 224 Mo.App. 736, 27 S.W.2d 72 (1930); *Amber v. Davis,* 221 Mo. App. 448, 282 S.W. 459 (1926).

▉ Where a trial court awards a decree of specific performance to a purchaser of land, inevitably a period of time elapses between the date when the land should have been conveyed in fulfillment of the contract and the date of the decree ordering the performance. As incident to its decree, the trial court has the discretion to relate performance to the original date of the agreement through an additional award of any costs caused by the delay. This award does not arise as legal damages from the breach of the contract; rather, it is more in the nature of an equitable accounting between the parties in affirmance of the contract. 71 Am.Jur.2d *Specific Performance*

Section 217 (1973). Faced with either similar or identical facts to those presented in *Cal-Val,* courts in a number of jurisdictions have, in addition to specific performance, awarded purchasers the interest rate differential as compensation for the delay in conveying the real estate. *Rekhi v. Olason,* 28 Wash.App. 751, 626 P.2d 513 (1981); *Reis v. Sparks,* 547 F.2d 236 (4th Cir.1976); *Godwin v. Lindbert,* 101 Mich.App. 754, 300 N.W.2d 514 (1980); *Hutton v. Gliksberg,* 128 Cal. App.3d 240, 180 Cal.Rptr. 141 (1982); *Regan v. Lanze,* 47 A.D.2d 378, 366 N.Y.S.2d 512 (1975); *Foust v. Hanson,* 612 S.W.2d 251 (Tex.Civ.App.1981).

The issue raised by this appeal is whether the increased costs related to the construction contract arise directly and proximately from the Sellers' failure to convey the real estate lot upon which the construction was to be performed, so as to hold the Sellers accountable for the increased costs as incident to an award of specific performance. In determining the standard of recovery, the courts that have addressed the issue concerning a purchaser's claim for costs caused by a delay in the delivery of possession, largely analogize to the general principles relating to legal damages, although exercising a range of discretion not recognized in actions at law. 7 A.L.R.2d 1204 Section 20 (1949). At the same time, theoretical inconsistencies are recognized between legal damages and an award of damages incident to a decree of specific performance. *See, e.g. Reis v. Sparks, supra; Walker v. Benton,* 407 So.2d 305, 307 (Fla. App.1981). In *Ragan v. Lanze,* 47 A.D.2d 378, 366 N.Y.S.2d 512 (1975), the New York Supreme Court allowed only those costs "directly attributable" to the Seller's delay. The cost of constructing certain planned improvements on the property subject to the decree of specific performance were held lacking in the "ring of clear predictability of consequence for which an unsuccessful good faith litigant should ordinarily be held responsible." 366 N.Y.S.2d at 516.

▉ To remain consistent with the court of equity's authority to adjust the rights of the parties in retrospectively en-

forcing the contract at issue, only those costs relating to the affirmance of the subject matter of the decree of specific performance are recoverable. Unlike *Cal-Val Construction*, the Buyers here seek both affirmance of the contract and legal damages for its breach. None of the cases cited by them involved the situation presented here: a purchaser seeking the value of the promised performance in addition to the performance of the contract itself. See *Dunning v. Alfred H. Mayer Co.*, 483 S.W.2d 423, 427 (Mo.App.1972). Under the circumstances no abuse of the trial court's discretion occurred in the denial of the increased financing and construction costs relating to the contract to construct the Buyers' home, to which the Sellers were not parties.

In addition, the Buyers failed to prove with sufficient certainty the interest rate differential claimed to have been caused by the Sellers' delay in conveying title. Mr. Donald Rowland, an officer in charge of the real estate department at First Bank of Commerce, Columbia, Missouri, testified that on October 1, 1979 the Buyers applied for a conventional construction loan, to be followed by a permanent or end loan. The interest rate quoted to them by Mr. Rowland at the time of 11.4% plus an origination fee of 1% was based upon construction rates. Rowland testified he made no commitment for the interest rate on a permanent loan since permanent loans are determined by the market rate upon completion of the construction. Although the contract between the Buyers and their builder set a completion date of January 10, 1981, no evidence was presented as to the market rate of permanent loans as of that date. As of the date of the trial, October 22, 1980, Rowland testified that the interest rate *at his particular bank* for permanent loans was 13.5% plus a 2% origination fee, although he also stated that "everybody's different." He testified that interest rates for construction loans as of the date of trial was 15% plus 1%. Although Reid Creath, the builder, testified on behalf of Buyers, no testimony was given concerning the length of time necessary to construct the home.

Recovery for the interest rate differential on real estate loans has been computed as the difference between the interest rate the Buyer had committed to him as of the date of closing and the most favorable interest rate available at the time of the judgment, computed over the life of the contract, and discounted to its present value. See *Turley v. Ball Associates Limited*, 641 P.2d 286, 289 (Colo.App.1981); *Walker v. Benton*, 407 So.2d 305, 307–308 (Fla.App. 1981). Here, Buyers had no loan commitment until almost one month after the date of closing. They failed to adduce evidence on the rate of interest on the permanent or end loan and the length of the construction. Rowland's testimony was not based upon the most favorable interest rate available to the Buyers at the time of trial, but rather the interest rate available at his particular bank. See *Cal-Val Construction, Inc. v. Mazur, supra.* Finally, the Buyers testified as to the length of time which they planned to live at their newly constructed home in an attempt to provide a length of time to compute the damages. An award to Buyers for the increased financing costs based upon the evidence adduced could only rest upon speculation and conjecture and thus was properly denied. See *Haggard v. Mid-States Metal Lines, Inc.*, 591 S.W.2d 71, 77 (Mo.App.1979); *Sides Construction Co. v. Arcadia Valley R–II School District*, 565 S.W.2d 761, 768 (Mo.App.1978). Because of the disposition of this appeal, the Buyers' argument to remand to the trial court to assess damages as of the date of the appeal need not be considered.

The Buyers' appeal is ruled adversely to them.

The judgment of the trial court is in all respects affirmed on all three counts. The Buyers shall have 30 days to pay the purchase price of $10,000 into the registry of the court. Sellers shall have 30 days thereafter to deliver to the Buyers either an abstract showing marketable title in fact, or a commitment for an owner's policy of title insurance, and if title be marketable in fact to Lot 11, Plat 1, Oak Cliff Subdivision

in Boone County, then title shall be conveyed from Sellers to Buyers in a general warranty deed. The Buyers' judgment on Count II is affirmed to construct a house subject to the plans contained in plaintiff's Exhibit 13. The Buyers pursuant to the trial court judgment are not to be awarded damages. The cross-appeal is ruled against Sellers. The costs on appeal are to be divided equally among the parties.

All concur.